13 So.3d 546 (2009)
Faith BROOKS, et al.
v.
UNION PACIFIC RAILROAD COMPANY, et al.
No. 2008-C-2035.
Supreme Court of Louisiana.
May 22, 2009.
*548 Hymel, Davis & Petersen, L.J. Hymel, Jr., Michael Reese Davis, Baton Rouge, Tim Paul Hartdegen, Kenneth Alan Goodwin, New Orleans, for applicant.
Fraser, Morris & Wheeler, David Andrew Fraser, Pamela L. Courtney, Keiser Law Firm, Randall Brian Keiser, David Heath Trahan, Laborde & Neuner, James L. Pate, Ben Louis Mayeaux, Phelps Dunbar, Harry Alston Johnson, III, Baton Rouge, for respondent.
VICTORY, J.
We granted a writ application in this class action lawsuit to determine the proper standards for analyzing class certification and whether the court of appeal correctly applied these standards in decertifying the class in this case. After reviewing the record and the applicable law, we affirm the judgment of the court of appeal but remand the matter for the trial court to consider certifying a class or classes based on the criteria set forth in this opinion.

FACTS AND PROCEDURAL HISTORY
On April 10-11, 1995, a heavy rainstorm in the City of Oakdale resulted in large scale flooding on the east side of the elevated Union Pacific Railroad ("UPRR") tracks which run north to south through the city. Various property owners filed suit in 1996 against UPRR and the State of Louisiana, through the Department of Transportation ("DOTD"). The plaintiffs amended their petition in 1999 to allege, inter alia, strict liability on the part of UPRR and to allege the prerequisites for a class action. The plaintiffs filed a Second Supplemental and Amended Petition in 2001 to add the City of Oakdale, the Allen Parish Police Jury and their insurers as defendants, alleging liability based on strict liability and negligence. The plaintiffs also dismissed the DOTD as a defendant. In the amended petition, plaintiffs alleged that three stormwater drainage structures underneath the railroad tracks were inadequately designed and maintained for their intended purpose.[1] In a *549 fourth amended petition, the plaintiffs alleged that an area referred to as the "West Fork Caney Creek Basin" (the "Eastern Basin") was also flooded as a result of the defendants' negligence, and sought to add this area of residents to the class.[2] Plaintiffs sought recovery mainly for property damages, with some personal injuries, alleging that defendants combined fault caused flooding of their properties. This amended petition delineated three geographical areas or basins which plaintiffs allege were flooded by the combined acts of the defendants: the Northern or Stream "J" Drainage Basin; the West Fork Caney Creek Drainage Basin [the "Eastern Basin"]; and the Southern Drainage Basin. The petition also identified three sub-basins within the Southern Basin.[3] In addition to alleging that UPRR failed to design and maintain two stormwater drainage structures under the tracks in the Northern and Southern Basins, the plaintiffs alleged that the City of Oakdale negligently designed and maintained various stormwater drainage facilities, including the "West Fork Caney Creek," ("WFCC") which was the primary drainage canal in the Eastern Basin, and Stream "J," and that outside the city limits, the Parish similarly negligently designed and maintained West Fork Caney Creek and Stream "A." Plaintiffs have also alleged strict liability on the part of all defendants. Based on plaintiffs' counsel's survey of potential plaintiffs, approximately 1,600 individuals were adversely affected by the flooding.
A three-day certification hearing was held before Judge Robert Brinkman, sitting ad hoc following the recusals of several local judges. During the hearing, plaintiffs presented the live testimony of several class representatives, Dr. Donald Barbe, an expert hydrologist, and other witnesses. The defendants presented the live testimony of two experts, Dr. Lee Lancon and Dr. Gary Lewis. The evidence established that UPRR's tracks acted as a levee during the flood, obstructing drainage from east to west. Plaintiffs' witnesses testified that the two drainage structures under the tracks, one in the north and one in the south, were undersized and improperly maintained, and that the drainage ditches leading to the structures were filled with trees, bushes, railroad ties and trash. The stream leading into the northern drainage structure was referred to as "Stream J" and it flowed from east to west from WFCC into UPRR's northern drain. The plaintiffs' witnesses testified that the City failed to properly maintain Stream J. In the Southern Basin, Stream A was a drainage ditch maintained by the Parish which flowed east to west into UPRR's southern drainage structure and the plaintiffs presented testimony that the Parish failed to properly maintain Stream A. WFCC was the major drainage canal located on the eastern *550 perimeter of the Northern and Southern drainage basins and it ran from north to south. The plaintiffs' witnesses testified that the City and Parish failed to properly maintain WFCC.
Dr. Vijay Singh, plaintiffs' former expert, testified by way of deposition. Dr. Singh used two computer models to study the flooding in the Northern and Southern basins:[4] (1) the Hydrologic Engineering Center-Hydrologic Modeling System (HEC-HMS), which is a software program package that simulated the rainfall and runoff processes in the drainage systems in each sub-basin; and (2) the Hydrologic Engineering Center-River Analysis System (HEC-RAS), which used the computed flows from the HEC-HMS to estimate the peak flood elevations at selected locations in a basin or sub-basin. His report concluded that the predominate cause of flooding in the Southern Basin was the UPRR culvert across Stream A and the predominate cause of flooding in the Northern Basin was the UPRR culvert across Stream J. Further, he reported that the flooding was also caused by the breach of the WFCC and its diversion into Stream J. He testified in his deposition that the level of flooding probably was the same in each sub-basin, but that localized differences within each sub-basin, such as elevations, ditches and obstructions around properties, could result in different levels of flooding. He testified that the diversion of WFCC into Stream J would have impacted the area in the immediate vicinity of Stream J more than other areas in the Northern Basin.
Dr. Barbe adopted Dr. Singh's report and testified to the following: the predominant cause of flooding in the Southern Basin was the insufficient size of UPRR's drainage facility under its railroad tracks at Stream A and that this also caused water from the Southern Basin to flow into the Northern Basin; the predominant cause of flooding in the Northern Basin was UPRR's drainage structure at Stream J and that this also caused water to back up and flow into the Southern and Eastern Basins; (3) the predominant cause of flooding in the Eastern Basin was the improper maintenance of WFCC.[5] He also testified that the defendants' combined fault impacted all of the properties in the three basins. He testified that "you can't just look at the flooding here [in one basin] by only looking at this basin ... [y]ou need to include the entire area to look at *551 the causes of flooding in the eastern basin." On cross-examination, Dr. Barbe testified as follows:
Q. Okay. Now, isn't it going to take a dynamic model in order to determine the affect of all these different households, won't it take a dynamic model for each one of them to determine for example how the ones on 81 are affected as compared to the ones at 126?
A. Well, first off, I think the ones up there are not in the basin.
Q. Okay. Well, let's just take this one up here, 218, that is in this basin [northern part of Eastern basin] and compare it with 126 down here [in the Southern basin], won't you need a dynamic model for each one of them to determine how these various factors you've talked about affects each individual household?
A. You don't need a dynamic model to say how these factors affected the households. You need a dynamic to say what percentage of these factors affected each of these households.
Q. Thank you. In other words you got differing degrees of impact on all these factors that you have enumerated on each individual household. Isn't that correct?
A. Yeah. All households, there was a different affect at different households, and a different result at different households.
Later, he testified that the predominant cause in each basin would be the same for each household in that basin. However, he testified that the secondary or tertiary causes would vary from household to household "depending also on the elevation of the house and its location." Contrary to plaintiffs' assertions in briefs, Dr. Barbe never testified that the percentage of fault attributable to each defendant would be the same within each basin.
Dr. Lancon testified for UPRR, primarily with respect to the Northern Basin. Regarding the cause of flooding in that basin he testified as follows:
Q. All right. Well, let's go back then and  I guess, first, let me ask you this. Did you make a determination as to whether or not areas within the Northern Basin were affected by the same factors throughout in this flood, or were they affected by localized factors that might have caused flooding at spots scattered even within the Northern Basin itself?
A. I feel that the  there were many different factors that caused flooding within the Northern Basin.
Q. Are those factors uniform to the entire basin?
A. No. They are  I think they are different. They are  some areas were affected  some of the factors affected certain areas differently that the others to differing degrees. And what I mean by that, the  obviously when West Fork Caney overflowed into the Northern Basin it overwhelmed the structure under the railroad tracks, and it  at that point in time it backed water up. But, when the structure that we identified earlier in the channel from Creswell up to Jackson, you know  Dr. Singh's model showed about a four foot rise in water surface elevation from the Stream J intersection  or actually just downstream of that structure to the upstream end. So, that  according to the model that Dr. Singh produced and we reviewed, or I reviewed, it had a four foot rise in the water surface elevation directly attributable to that particular structure. So, in that 
Q. And that is what  was that what was diverting water, that rise was diverting water to the 

*552 A. That rise definitely diverted water and it created, I think, flooding up in the area North of Jackson Street, right on the border Eastern border of the Northern Basin. Water backed up and spilled over, and went overland in that area. And once, once water leaves its, the banks of a channel and starts sheet flowing across a basin it is subject to localized undulations or ridges in existing terrain in the area, so it is going to create flood waters different from probably  from actually what would have been caused down in the lower reaches, say around Dixie or so, that was going to be mainly attributable to the railroad culvert and the fact the railroad culvert couldn't handle the additional flow that was being brought to it.
Q. Would that explain the reason for people in different parts of this basin to  or the reason they would explain that they saw water surging at their house or flowing at it into their house from different directions?
A. I think  yeah, I guess. ...
He listed seven different causes of flooding in the Northern Basin.[6] In Dr. Lancon's expert report, he concluded:
It is evident that the causes and/or the extent of flooding in the Northern Basin are not uniform. Each area within the Northern Basin is affected differently by natural drainage patterns, diversion of West Fork Caney Creek and existing ditches, levees and structures.
He included a chart which explained that the primary cause of flooding for all regions in the Northern Basin was the same, but the secondary causes differed.
Dr. Lewis testified for UPRR, primarily with respect to the Southern Basin. He testified that in order to evaluate the causes of flooding in the Southern Basin, you have to do an individualized analysis at the property and that there were a lot of little sub-basins in that basin. He testified that he "would agree with Dr. Barbe who said they are all different," and that "[t]hey all need to be analyzed independently, individually." In addition, Dr. Lewis's expert report stated that:
Residences in different watersheds [basins] are not in the same hydrologic system, and standards of hydrologic assessment require that property flooding in separate watersheds be independently analyzed.
After taking the matter under advisement, Judge Brinkman certified the suit as a class action. Specifically, the trial judge stated:
Flooding on the eastern side of Oakdale was caused mostly by inadequate drain under the railroad, which had been built many years before the flood. Failure by the Town and Allen Parish Police Jury to keep the natural drains in Oakdale that provided drainage from north to south, caused flooding in the south end of town. This condition also caused the water to flow to back up into the north part of Oakdale and some of this water also flowed east toward the railroad tracks.
*553 The trial judge found that the requirements of commonality, typicality, adequacy of representation and predominance were satisfied. Regarding predominance, the trial judge stated "this Court finds that the `predominance requirement' for a class action suit has been satisfied in this case because the disallowance of individual trials is warranted by the subjective gain in efficiency. See Daniels v. Witco Corp., [03-1478 (La.App. 5 Cir. 6/1/04), 877 So.2d 1011]." In addition, the trial judge stated that "[a]dditionally, the Court, through evidence already offered and evidence to be offered at a future hearing focusing on a refinement of the three drain basins, is satisfied that a class can be defined objectively and determine the constituency of that class for the purpose of any judgment that may ultimately be rendered in this case." After the parties received the trial court's reasons for judgment, the parties did not agree on the proper wording of the judgment. Plaintiffs submitted a proposed judgment which delineated the Northern, Southern and WFCC/Eastern basins as separate classes; defendants' proposed judgment did not. On July 23, 2007, the trial court issued an opinion which stated that the judgment which did not delineate the three basins best reflected the court's reasons for judgment.
The court of appeal reversed and de-certified the class, finding that the commonality and predominance requirements were not met, reasoning as follows:
Despite plaintiffs' arguments to the contrary, the causes of the claimed injuries to person or property vary from class member to class member. The plaintiffs allege that the railroads installed inadequate box culverts and that they failed to maintain them appropriately thereby causing the plaintiffs to sustain damage when their homes flooded. On the other hand, the plaintiffs contend that the City and Parish designed and maintained an inadequate overall drainage system that caused the plaintiffs' damages. Moreover, the plaintiffs' homes are located in three distinct drainage basins and received varying degrees of damage depending on their individual elevations and surrounding circumstances. Plaintiffs argue that because the actions of all of the defendants caused elevated water levels in all of the drainage basins, it is just a matter of how many inches of water to attribute to each defendant in each area.
We are unconvinced by this argument. Each plaintiff would still need to establish not only that defendant X contributed a certain amount of water to the area but also that defendant X's contribution would have resulted in the alleged damage even if defendant Y had not been negligent. The answers to these questions could vary widely depending on the drainage basin, the elevation of the home, and other individual factors related to each property. Furthermore, despite the fact that the allegations of negligence on the part of the defendants are in the same class of actions, the plaintiffs actually allege specific and different acts of negligence on the part of each defendant. The only common event is the massive rainfall which is not attributable to the defendants.
To summarize, absent a common cause, it will be necessary for each class member to provide individualized proof of causation as well as damages. In addition, the plaintiffs' theory that the combined effect of all the defendants' negligent acts can fulfill the common cause requirement was specifically addressed in Ford [v. Murphy Oil U.S.A., Inc., 96-2913 (La.9/9/97), 703 So.2d 542]. The court concluded that such theories were inappropriate for class actions. Id. Accordingly, we find that the plaintiffs *554 failed to establish that common issues predominate, and therefore, the trial court abused its discretion in granting class certification. We pretermit discussion of the remaining assignments of error as our resolution of the above issue is dispositive.
Brooks v. Union Pacific R. Co., 07-1427 (La.App. 3 Cir. 6/4/08), 985 So.2d 864, 866 (en banc). We granted plaintiffs' writ application. Brooks v. Union Pacific R. Co., 08-2035 (La.11/14/08), 996 So.2d 1080.

DISCUSSION
A class action is a nontraditional litigation procedure which permits a representative with typical claims to sue or defend on behalf of, and stand in judgment for, a class of similarly situated persons when the question is one of common interest to persons so numerous as to make it impracticable to bring them all before the court. Ford v. Murphy Oil U.S.A., Inc., 96-2913 (La.9/9/97), 703 So.2d 542, 544. The purpose and intent of class action procedure is to adjudicate and obtain res judicata effect on all common issues applicable not only to persons who bring the action, but to all others who are "similarly situated." Id.[7]
The determination of whether a class action meets the requirements imposed by law involves a rigorous analysis. The trial court "must evaluate, quantify and weigh [the relevant factors] to determine to what extent the class action would in each instance promote or detract from the goals of effectuating substantive law, judicial efficiency, and individual fairness." McCastle v. Rollins Environmental Services of Louisiana, Inc., 456 So.2d 612, 618 (La.1984). In so doing, "the trial court must actively inquire into every aspect of the case and should not hesitate to require showings beyond the pleadings." Id. (Citing Stevens, v. Board of Trustees of Police Pension Fund of City of Shreveport, 309 So.2d 144, 152 (La.1975)). "[I]f there is to be an error made, it should be in favor and not against the maintenance of the class action, for it is always subject to modification should later developments during the course of the trial so require." Id. at 620 (citing La. C.C.P. art. 593.1(B); Esplin v. Hirschi, 402 F.2d 94 (10th Cir.1968); 1 H. Newburg, Class Actions, § 1160(e) (1977)).
In reviewing a trial court judgment regarding class certification, factual findings are subject to the manifest error standard, but the trial court's ultimate decision of whether or not to certify the class is reviewed by the abuse of discretion standard. See Banks v. New York Life Ins. Co., 98-0551 (La.7/2/99), 737 So.2d 1275, 1280 (on rehearing) (reviewing the trial court's decision to certify the class under the abuse of discretion standard). Under federal law, the review of class certification decisions is also under the abuse of discretion standard. Gene and Gene LLC v. Biopay LLC, 541 F.3d 318 (5th Cir.8/14/08). "Implicit in this deferential standard is recognition of the essentially factual basis of the certification inquiry and of the district court's inherent power to manage and control pending litigation." Id. at 325 (citing Allison v. Citgo Petroleum Corp., 151 F.3d 402, 408 (5th Cir. 1998)). However, whether the district court applied the correct legal standards in determining whether to certify the class is reviewed de novo.
The requirements for class certification applicable to this action are found in Articles 591-597 of the Louisiana Code of *555 Civil Procedure as enacted in 1961.[8] These articles were adopted from Federal Rule of Civil Procedure 23 as originally enacted in 1937.[9]Stevens, supra at 148 (citing Official Revision Comment (b), La. C.C.P. art. 591). Article 591 provided:
A class action may be instituted when the persons constituting the class are so numerous as to make it impracticable for all of them to join or be joined as parties, and the character of the right sought to be enforced for or against the members of the class is:
(1) Common to all members of the class; or
(2) Secondary, in the sense that the owner of a primary right refuses to enforce it, and a member of the class thereby becomes entitled to enforce the right.
The "common character" requirement "restricts the class action to those cases in which it would achieve economies of time, effort, and expense, and promote uniformity in decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." McCastle, supra at 616 (citing Cf. Proposed Amendments to Rules of Civil Procedure for the United States District Courts, Rule 23, Advisory Committee's Note, 39 F.R.D. 69, 102-103). "Its object is to identify the cases where a class action promises important advantages of economy of effort and uniformity of result without undue dilution of procedural safeguards for members of the class or for the opposing party." Id. "When a `common character' of rights exists, a class action is superior to other available adjudicatory methods for the purpose of promoting the basic aims of a procedural device: (1) effectuating substantive law; (2) judicial efficiency; and (3) individual fairness." Id. (Citing Guste v. General Motors Corp., 370 So.2d 477, 488 (La.1978)).
In Stevens, this Court focused on the proper analysis for determining whether the character of the right sought to be enforced was "common" to the class. The Court noted that the Federal Rules were amended in 1966 "in an attempt to translate these abstractions into pragmatic terms" and found that "the criteria set forth [by Federal Rule 23 as amended in 1966] are, we think, indicative of the guidelines for ascertaining the occasions for maintaining class actions under our own code articles." Stevens, supra at 150.[10] *556 The Court in Stevens also enunciated certain "fairness" factors to be considered.[11] Following the directive in Stevens, this Court has used the factors set forth in Federal Rule 23 as guidelines to determine whether to allow a class action under former articles 591-597, even though these code articles did not contain these federal factors. Banks, supra at 1280 (applying "the factors set forth in Articles 591-597 and Federal Rule 23 and the state and federal jurisprudence interpreting our state articles and the federal rule"); Ford, supra at 546; McCastle, supra at 617. For that reason, in our analysis of certification under the pre-1997 statute, this Court has required, among other factors, that there be questions of law or fact common to the class and that those questions predominate over questions affecting only individual members. See e.g., Banks, supra; Ford, supra; McCastle.[12]
*557 As part of our analysis of commonality and predominance in mass tort cases such as this, we have held that "only mass torts `arising from a common cause or disaster' may be appropriate for class certification." Ford, supra at 550. In Ford, we discussed the United States Supreme Court case of Amchem Products, Inc. v. Windsor, 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997), which found that "mass tort cases arising from a common cause or disaster may, depending upon the circumstances, satisfy the predominance requirement."[13] The Supreme Court further expressed that although the comments to Rule 23 cautioned that mass tort cases were "ordinarily not appropriate for certification," "the text of the rule does not categorically *558 exclude mass tort cases from certification." Ford at 549. Accordingly, we held in Ford that mass torts could only be brought as a class action if they arose from a common cause or disaster and that this holding was in line with the underlying reasoning of this Court's prior jurisprudence. Ford at 550. This ruling was inherently based on the fact that causation is an essential part of the liability determination and if causation is not the same for each plaintiff, individual trials on causation would be required which would defeat the purpose of the class action device.
Specifically, in Ford we held that class certification was inappropriate in a case against four petrochemical plants which plaintiffs claimed emitted noxious odors, fumes and gases over several years causing various personal injuries and property damages. We reasoned as follows:
The court of appeal made the following erroneous crucial finding based on McCastle that "[o]ffering the same facts, all class members will attempt to establish that the activities of Mobil and Murphy emitted hazardous, toxic, corrosive, or noxious odors, fumes, gases or particulate matter that caused them damage. The issue of these defendants duty predominates over individual questions." 681 So.2d at 407. However, far from offering the same facts, each class member will necessarily have to offer different facts to establish that certain defendants' emissions, either individually or in combination, caused them specific damages on yet unspecified dates (which dates may run into the hundreds or even thousands). The causation issue is even more complicated considering the widely divergent types of personal, property and business damages claimed and considering each plaintiffs' unique habits, exposures, length of exposures, medications, medical conditions, employment, and location of residence or business. In addition, each plaintiff will have to prove that the specific harm he suffered surpassed the level of inconvenience that is tolerated under C.C. art 668. By the very nature of the claims that have been made, the length of time involved, and the vast geographical area in which the class members live, the degree of inconvenience or damage suffered will vary greatly as to the individual plaintiffs. Lastly, the mere finding of "defendants duty" not to pollute will do little to advance the issues in this case. There appear to be far too many individual liability issues which could not be tried separately, as that is prohibited by article 593.1(C)(1). As aptly stated by Judge Schott in his dissent, "[o]ne plaintiff cannot prove individual causation and individual damage based on the exposure of another plaintiff to a particular emission." 681 So.2d at 411. The individualistic causation and liability issues are further magnified in this case by the claim that four different sources of emissions are involved. This case simply strays too far from the "true" class action that the Legislature intended to allow and we refuse to extend McCastle.

Ford, supra at 548-549.[14]
In requiring common causation in a mass tort case, we point out that this *559 does not mean that the amount or extent of damages must be common to all class members. As we have stated, "the mere fact that varying degrees of damages may result from the same factual transaction and same legal relationship or that class members must individually prove their right to recover does not preclude class certification." Bartlett v. Browning-Ferris Industries Chemical Services, Inc., 99-0494 (La.11/12/99), 759 So.2d 755, 756. However, in order to meet the common cause requirement, each member of the class must be able to prove individual causation based on the same set of operative facts and law that would be used by any other class member to prove causation. For example, the cause of flooding must be the same for each member of the class, and if there is more than one cause of flooding, each of these causes must be the same for each class member.[15] This is difficult in a mass tort case involving more than one defendant, more than one cause, and more than one theory of liability.
In this case, the trial court certified a class of residents flooded in all three basins combined, finding that, as to causation, flooding in the entire area was "caused mostly by the inadequate drain under the railroad," flooding in the Southern basin was caused by the failure of the City and Parish to maintain the natural north-south drainage, and that "this condition" also caused water to flow back up to the Northern basin and some of this water also flowed east toward the railroad tracks.
The trial court's factual finding of common causation was manifestly erroneous as all experts testified that the predominate cause of flooding would vary depending on whether an individual lived in the Northern, Southern or Eastern basin. Further, plaintiffs' claims that the combined fault of all three defendants contributed to the flooding in all three basins based on their theory of "interflow" between basins does not satisfy the common cause requirement.[16] Flooding due to "interflow" was not the predominate cause of flooding in *560 any of the basins, and even if "interflow" by causes associated with each defendant contributed to flooding in the entire area, the cause of the "interflow" flooding would still vary depending on the location of each particular household. Thus, there can be no finding of common causation in this mass tort case as to the entire area.
The trial court also found that the predominance requirement was met because "the disallowance of individual trials is warranted by the subjective gain in efficiency." The trial court did not conduct a sufficiently thorough analysis of this requirement. An inquiry into predominance tests "whether the proposed classes are sufficiently cohesive to warrant adjudication by representation." Amchem, supra, 117 S.Ct. at 2249. The predominance requirement is more demanding than the commonality requirement and, as such, mandates caution, especially where "individual stakes are high and disparities among class members great." Id. at 2250. The predominance requirement "entails identifying the substantive issues that will control the outcome, assessing which issues will predominate, and then determining whether the issues are common to the class," a process that ultimately "prevents the class from degenerating into a series of individual trials." O'Sullivan v. Countrywide Home Loans, Inc., 319 F.3d 732, 738 (5th Cir.2003).[17] The trial court did not conduct the proper analysis in determining whether common issues predominated over individual issues as to certification of a class consisting of all three basins.
However, former La. C.C.P. art. 593.1(B) provided that the court may, at any time prior to decision on the merits, alter, amend, or recall its initial ruling on certification and may enlarge, restrict, or otherwise redefine the constituency of the class or the issues to be maintained in the class action.[18] Former article 593.1(C) also provided that the court may adopt a plan for the management of the class action subdividing the action and separating the issues for trial.[19] Just as we found in Ford, although class certification as initially ordered by the trial court was not appropriate, a more limited class action might be. 703 So.2d at 549. Plaintiffs assert that the cause of flooding in each basin is the same for each household in that basin, and that therefore, the class could be divided by basin. This presents a more viable alternative and a much closer issue with regard to common causation and predominance.
In order to certify a class for each basin, or for even more limited areas, *561 there must be a common cause for each member of the class. One class member must be able to prove the cause of his flooding based on the same set of operative facts as would be offered by every other member of that class to prove their cause of flooding. If more than one cause is involved, each of these causes must be common to all members.
If common causation is found for a particular area or basin, the trial court must then determine whether the common issues predominate over individual issues. As stated above, this involves identifying the substantive issues that will control the outcome, assessing which issues will predominate, and then determining whether the issues are common to the class. For if common issues do not predominate, then the end result would be a series of mini-trials which the predominance requirement is intended to prevent. With these guidelines in mind, the trial court must conduct this analysis in order to determine whether certification divided by basin, or some other more limited basis is warranted. In addition to the difficult and rigorous analysis that must be conducted as to commonality and predominance, the trial court must of course conduct an analysis of the other factors relevant to class certification regarding each basin or any other more limited proposed class.

CONCLUSION
The determination of whether a class action meets the requirements imposed by law involves a rigorous analysis in which the trial court must evaluate, quantify and weigh the relevant factors to determine the extent to which the class action would promote or detract from the goals of effectuating substantive law, judicial efficiency and individual fairness. As we previously held in Ford, only mass torts arising from a common cause or disaster may be appropriate for class certification. In this mass tort case, this means that the cause of flooding must be the same for each class member, and if there is more than one cause of flooding, each of the causes must be the same for each class member. If each class member has to prove causation separately, this would defeat the purpose of a class action. This is difficult when multiple defendants and causes are involved. In addition, in order to determine whether common issues predominate over individual issues, the trial court must identify the substantive issues that will control the outcome of the case, assess which issues will predominate, and then determine whether the issues are common to the class. This process ultimately prevents the class from degenerating into a series of mini-trials. In this case, the trial court committed manifest error in making a factual finding that causation was common to the class, as all experts testified the predominate cause of flooding varied from basin to basin. In addition, the trial court did not apply the correct legal standard in determining whether common issues predominated over individual issues. Thus, the trial court erred in certifying the class as a whole. However, it seems that certification on a more limited basis, either divided by Northern, Southern and Eastern basin, or some other basis, may be appropriate. The trial court should consider certifying the class or classes on a more limited basis using the standards we have set out today.

DECREE
For the reasons expressed herein, the judgment of the court of appeal decertifying the class is affirmed; however, the case is remanded to the trial court to consider certifying the class on a more limited basis.
AFFIRMED AND REMANDED.
TRAYLOR, J., dissents and assigns reasons.
*562 TRAYLOR, Justice, dissenting.
Although the percentages of the defendants' fault may ultimately be determined to be different for each of the basins flooded during the rain event of April 10-11, 1995, I believe that the interplay of the defendants' alleged fault satisfies the common cause requirement for class certification. Therefore, I do not think that the trial judge's action in certifying the class error. I respectfully dissent.
NOTES
[1] The three structures were described as (1) the northernmost such stormwater drainage structure located near the intersection of Beck Avenue and Highway 165; (2) the middle stormwater drainage structure located approximately 500 feet south of the intersection of West Jackson Street and Highway 165; and (3) the third and southernmost stormwater drainage structure located approximately 1800 feet south of the intersection of Pelican Road and Highway 165. The plaintiffs later abandoned their claims with respect to the northernmost railroad drainage structure and filed a separate suit regarding that sub-basin entitled Paula Karam, el al. v. Union Pacific Railroad Company, et al., Docket No. C-2007-328, pending in the 33rd Judicial District Court. The second and third drainage structures described in the amended petition correspond to the Northern Basin and the Southern Basin, respectively.
[2] The trial judge presiding prior to ad hoc Judge Robert Brinkman declined to permit the fourth amended and supplemental petition to be filed, and both the Third Circuit and this Court denied plaintiffs' writ applications on this issue. Brooks v. Union Pacific R. Co., 05-1847 (La. 1/27/06), 922 So.2d 555. The defendants have objected to evidence concerning the Eastern Basin which they believe is an attempt to expand the pleadings in contravention of the earlier decision to deny the filing of the fourth amended petition.
[3] These were described as the Stream "A" Drainage Basin, the Stream "H" Drainage Basin, and the Stream "I" Drainage Basin.
[4] Dr. Singh's report stated that it did not address residential flooding in the eastern basin, but did consider the effects of the diverted flow from WFCC into Stream J.
[5] Specifically, Dr. Barbe testified as follows:

Q. All right. I will [sic] like for you to then tell me, if you will, what in your opinion caused the flooding in these areas that we have outlined on this map?
A. Okay. The predominate cause, and I'm starting from the southern going to the northern then to the eastern basins, was the facility here labeled as Stream A under the railroad tracks. That facility was severely undersized. It caused water to flood this area, and in fact back up, and go across into the northern basin. In the northern basin the predominant cause was the facility at, which labeled, Stream J. That facility because of its size and maintenance within the railroad tracks and then beyond the ditch along Stream J caused water to back up in here, in the northern basin. Added to that is the water from the southern basin. These caused the waters in Stream J to back up all the way. Well, it backed up here into the northern basin. This caused then the water that was flowing, coming down West Fork Caney Creek, the West Fork Caney Creek because of its maintenance south of the intersection with Stream J and because of this back up of water here, which caused less of a hydraulic gradient here, so that lets water that would down that way [sic] could go down that way this caused flooding then to back up in this areas in here in the eastern basin.
[6] The causes listed by Dr. Lancon were: (1) the rain event; (2) runoff that would normally stay within the banks of WFCC and Stream J; (3) water diverted because the culvert in WFCC between Jackson and Creswell Streets was not large enough; (4) a high ridge located south of Thom Street that cut across WFCC and prevented WFCC from overflowing its banks downstream of Stream J and therefore allowed water to overflow its banks upstream; (5) a similar ridge downstream of Stream J; (6) the downtown area where the storm drainage system would have surcharged and caused sheet flow into the confluence with Stream J and WFCC; (7) ditches and culverts at UPRR and U.S. 165 along Stream J.
[7] See Ford, supra at 544-545 for a discussion of the history of class action statutes in the United States and in Louisiana.
[8] La. C.C.P. art. 591 was amended by Acts 1997, No. 839, § 1. See footnote 12, p. 14, infra. However, the amended article only applies to actions filed on or after July 1, 1997. Banks, supra.
[9] Frank L. Maraist, 1 Louisiana Civil Law Treatise: Civil Procedure, § 4.12, pp. 99-101 (2nd ed.2008) and Stevens, supra, for a history of the adoption of these articles.
[10] F.R.C.P. 23(a) provides:

Prerequisites to a Class Action. One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.
These requirements are referred to as the "numerosity," "commonality," "typicality," and "adequacy" requirements.
F.R.C.P. 23(b) provides, in pertinent part:
An action may be maintain as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:
. . .
(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to these findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.
This section embodies the "predominance" requirement.
[11] In adopting the requirements of F.R.C.P. 23(b) as factors to be used in determining whether the "character of the right" is common to members of the class, this Court explained in Stevens:

These [federal] guidelines emphasize limiting the use of the class action  when a common-based right is at issue and other requirements are met (such as too-numerous parties to join and adequate representation of the class)to occasions where the class action will be clearly more useful than other available procedures for definitive determination of a common-based right, if such definitive determination in the single proceedings should be afforded in the interests of the parties (including both the class and the opponent(s) to it) and of the efficient operation of the judicial system.
In determining how the legislature intended the courts to define and apply the concept of allowing a class action to enforce rights with a common character, we are mindful of the basic goals or aims of any procedural device: to implement the substantive law, and to implement that law in a manner which will provide maximum fairness to all parties with a minimum expenditure of judicial effort. Implicit, then, in decision that rights are of a common character is a consideration of the extent to which a clear legislative policy might be thwarted, or hampered in its implementation, by the lack of availability of the class action device.
But this does not end the inquiry. Fairness to the parties demands at the least that the relationship between the claims of members of the class should be examined to determine whether it would be unfair to the members of the class, or to the party opposing the class, to permit separate adjudication of the claims. In determining whether it would be unfair to require separate adjudications, for instance, the courts should consider the precedential value of the first decision, as well as the extent of injustice that will be produced by inconsistent judgments in separate actions. Another factor to be considered, for example, is the size of the claims of the absent members of the class, for the greater the claim, the greater the interest of its owner in prosecuting it in a separate action.
Stevens, supra at 151.
[12] In 1997, the Legislature enacted a comprehensive revision of the class action procedure closely tracking the language of the 1966 amendments to the Federal Rules. La. C.C.P. art. 591, as amended in 1997, provides:

Art. 591. Prerequisites; maintainable class actions
A. One or more members of a class may sue or be sued as representative parties on behalf of all, only if:
(1) The class is so numerous that joinder of all members is impracticable.
(2) There are questions of law or fact common to the class.
(3) The claims or defenses of the representative parties are typical of the claims or defenses of the class.
(4) The representative parties will fairly and adequately protect the interests of the class.
(5) The class is or may be defined objectively in terms of ascertainable criteria, such that the court may determine the constituency of the class for purposes of the conclusiveness of any judgment that may be rendered in the case.
B. An action may be maintained as a class action only if all of the prerequisites of Paragraph A of this Article are satisfied, and in addition:
(1) The prosecution of separate actions by or against individual members of the class would create a risk of:
(a) Inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or
(b) Adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; or
(2) The party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or
(3) The court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to these findings include:
(a) The interest of the members of the class in individually controlling the prosecution or defense of separate actions;
(b) The extent and nature of any litigation concerning the controversy already commenced by or against members of the class;
(c) The desirability or undesirability of concentrating the litigation in the particular forum;
(d) The difficulties likely to be encountered in the management of a class action;
(e) The practical ability of individual class members to pursue their claims without class certification;
(f) The extent to which the relief plausibly demanded on behalf of or against the class, including the vindication of such public policies or legal rights as may be implicated, justifies the costs and burdens of class litigation; or
(4) The parties to a settlement request certification under Subparagraph B(3) for purposes of settlement, even though the requirements of Subparagraph B(3) might not otherwise be met.
C. Certification shall not be for the purpose of adjudicating claims or defenses dependent for their resolution on proof individual to a member of the class. However, following certification, the court shall retain jurisdiction over claims or defenses dependent for their resolution on proof individual to a member of the class.
Professor Maraist has explained that "[t]he revision confirmed some of the previous requirements for maintenance of a class action [La. C.C.P. arts. 591A(1)-(4)], added an additional requirement [La. C.C.P. art. 591A(5)], and adopted four specific types of class actions [La. C.C.P. arts. 591B(1)-(4)]." Maraist, supra at 101.
[13] The Supreme Court quoted from the Advisory Committee for the 1996 Revision of Rule 23, which noted that "`mass accident' cases are likely to prevent `significant questions, not only of damages but of liability and defenses of liability ... affecting the individuals in different ways." 521 U.S. at 625, 117 S.Ct. 2231 (citing Adv. Comm. Notes, 28 U.S.C.App. P. 697).
[14] In other mass tort cases, we have reached varying conclusions, based on the particular facts and circumstances of each case. In McCastle, the class was certified where the sole cause of injury were the noxious gases emitting from a single chemical storage site and the two defendants were the owner and operator of the site. In Williams v. State, we affirmed the certification of a class where 600 prisoners suffered from food poisoning after eating lunch at a state prison. 350 So.2d 131 (La. 1977). In Eubanks v. Bayou D'Arbonne Lake Watershed Dist., 95-0482 (La.4/21/95), 653 So.2d 578, we granted the plaintiffs' writ application and reinstated the judgment of the trial court which had certified a class of owners of property around a lake that had flooded. Although the class sued four defendants in that case, it does not appear that the flood was attributable to more than one cause. In Saden v. Kirby, 532 So.2d 108 (La. 1988), we granted plaintiffs writ and summarily ordered class certification where the plaintiff sued three different defendants alleging that flooding resulted from the construction of a sandbag levee across Highway 146 and from inadequate drainage. This case did involve 2 causes, construction of the sandbag levee and inadequate drainage; however, it was decided before our decision in Ford requiring common causation in mass tort cases, and by the time it came to this Court again, it involved only a single defendant and a single cause. Saden v. Kirby, 94-854, 94-926 (La.9/5/95), 660 So.2d 423.
[15] However, this does not mean that the percentage of damages attributable to each cause for each class member must be the same.
[16] We rejected this same argument in Ford, holding as follows:

Clearly, under Amchem, claims arising from the torts of individual defendants are not appropriate for class action as there is no "common cause" as to those claims for all class members. Plaintiffs' allegation, if it is a viable cause of action and can be proven, that the four defendants are jointly liable "by virtue of a synergistic accumulation or combination of releases ..." theoretically could arise from a common cause. However, as we have seen, the common issue of whether the defendants are emitting substances that do synergistically combine does not predominate over the individual liability issues in this case. Therefore, class certification is inappropriate.
703 So.2d at 550.
[17] In Banks, supra, we stated that reference to federal jurisprudence interpreting the federal class action rule was appropriate to determine whether to certify a class under Louisiana's class action statutes. 737 So.2d at 1280.
[18] This provision is now found in La. C.C.P. art. 592(A)(3)(c).
[19] Under former La. C.C.P. art. 593.1(B), the plan may provide for separate trials of the issues in this order: (1) liability issues, (2) determination of damage items common to the class and the basis for assessment thereof, (3) assessment of common damages on an appropriate basis, (4) determination and assessment of individual damages not common to the class in one or a series of trial involving one or more members of the class. McCastle, supra at 621.

La. C.C.P. art. 592(E)(5) now provides in pertinent part that:
... the court may not order the class-wide trial of issues dependent for their resolution on proof individual to a member of the class, including but not limited to the causation of the member's injuries, the amount of the member's special or general damages, the individual knowledge or reliance of the member, or the applicability to the member of individual claims or defenses.