ROBERT A. CHAISSON, Judge.
lain this action involving alleged negligence in the operation of a fertility clinic, plaintiffs moved for class certification of four distinct subclasses. The trial court rendered judgment granting certification of two of the proposed subclasses and denying certification of the other two proposed subclasses. Ochsner Clinic Foundation, the operator of the Ochsner Fertility Glinic, now appeals the certification of two of the subclasses,[1] and plaintiffs appeal the denial of certification of one of the other two subclasses.[2] For the following reasons, we reverse the certification of the first two subclasses, affirm the denial of certification of the third subclass, and remand the matter for further proceedings.
FACTS AND PROCEDURAL HISTORY
The Ochsner Fertility Clinic was in operation between 2003 and 2009, during which time 240 women were treated. Sometime in 2007, the Food and Drug Administration (FDA) conducted an inspection of the facility and reported paperwork errors in its records. Ochsner followed up on this report, and discovered that at least six frozen embryos were possibly mislabeled. It notified |4three patients about the problem and asked that they undergo genetic testing to identify the embryos. As a result of testing done in early 2009, four of the embryos were identified, but the remaining two were not.
Two of these six embryos were associated with Heather Hebert. Mrs. Hebert and her husband Duane filed suit on July 30, 2009, against Ochsner Clinic Foundation, Ochsner Fertility Clinic and Vincent Williams, an embryologist affiliated with the clinic, and sought certification of the suit as a class action.[3] The basic allegations of the petition are that Ochsner exercised inadequate control and supervision of the procedures used at the fertility clinic, that it did not institute standard operating procedures, that its hiring practices, especially in regard to Vincent Williams, were lax, and that these problems caused a lack of continuity in the operation of the clinic.
In response to this suit, Ochsner hired Mercer, a medical auditing company, to conduct an audit of the records of the entire fertility clinic operation. This com *916 pany reviewed the records of 348 in vitro fertilization cycles (IVF) and graded each cycle on a scale of one to four.[4] Grade 1 errors indicated that there were no discrepancies in the records. There were 255 cycles in this category. Grade 2 errors indicated minor discrepancies that could be clarified by reference to other information in the patient’s file and that did not indicate a significant problem. There were 58 cycles with this type of error, and Vincent Williams, the defendant embryologist, was implicated in 28 of these cycles. Grade 3 errors indicated the possibility of a clinically significant problem. There were 33 cycles with this type |5of error, and Vincent Williams was implicated in 28 of these cycles.[5] At the time of the audit, there were 53 patients with frozen embryos at the clinic. Thirteen of these had Grade 3 documentation problems which rendered their parentage uncertain. The remaining 40 had Grade 2 errors, although Mercer believed that for these the parentage identification was “very highly likely” correct and met FDA labeling standards. Mercer recommended that the 13 Grade 3 error embryos definitely not be released without genetic testing to insure correct parentage. It also recommended that out of caution the remaining 40 embryos should be subjected to genetic testing before release.
Upon review of the Mercer report, Ochs-ner decided on September 25, 2009, to close the clinic, and notified all 240 patients of this decision and of the Mercer audit. It also informed the patients with frozen embryos of its decision to genetically test, at its own expense, all of the embryos, whether having Grade 2 or Grade 3 errors, prior to their release.
The trial court held a class certification hearing at which the plaintiffs proposed four subclasses:
1) THE WILLIAMS SUBCLASS, defined as “All individuals who underwent in vitro fertilization (IVF) at Ochsner Fertility Clinic and had frozen human embryos at Ochsner as of September 25, 2009.”
2) THE GRAVES SUBCLASS, defined as “All individuals who underwent in vitro fertilization (IVF) at Ochsner Fertility Clinic and who did not have frozen embryos at Ochsner as of September 25, 2009, but who are identified in the Mercer External Audit Findings dated May 28, 2010 as having Grade 2 and/or Grade 3 documentation errors.”
3) THE HEBERT SUBCLASS, DEFINED AS “All individuals who underwent in vitro fertilization (IVF) at Ochsner Fertility Clinic and who have frozen human embryos which were created utilizing a donor and which did not receive infectious disease screening.”
|fi4) THE JONES SUBCLASS, defined as “All individuals who underwent in vitro fertilization (IVF) at Ochsner Fertility Clinic and who have suffered from fear, fright, mental anguish and emotional distress as a result of Ochsner closing its IVF clinic.”
The trial judge certified the Williams and Graves subclasses, but denied certification of the Hebert and Jones subclasses. Ochsner now appeals the certification of the Williams and Graves subclasses, and *917 the class proponents appeal the denial of certification of the Jones subclass. No appeal has been taken from the denial of the Hebert subclass.
APPLICABLE LAW
In Louisiana, class actions are governed by Louisiana Code of Civil Procedure art. 591 et seq. Article 591(A) provides that a class action must meet five threshold prerequisites, often referred to as numerosity, commonality, typicality, the adequacy of representation, and an objectively definable class. Specifically, the article requires that:
(1) The class is so numerous that join-der of all members is impracticable.
(2) There are questions of law or fact common to the class.
(3) The claims or defenses of the representative parties are typical of the claims or defenses of the class.
(4) The representative parties will fairly and adequately protect the interests of the class.
(5) The class is or may be defined objectively in terms of ascertainable criteria, such that the court may determine the constituency of the class for purposes of the conclusiveness of any judgment that may be rendered in the case.
In addition to these five prerequisites, Article 591(B) lists additional criteria, depending on the type of class action sought by the parties. The applicable additional consideration in this case is set forth in Article 591(B)(3). For this type of class action, the trial court must find:
|7(3) [T]hat the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class is superior to other methods for the fair and efficient adjudication of the controversy. The matters pertinent to these findings include:
(a) The interest of the members of the class in individually controlling the prosecution or defense of separate actions;
(b) The extent and nature of any litigation concerning the controversy already commenced by or against members of the class;
(c) The desirability or undesirability of concentrating the litigation in the particular forum;
(d) The difficulties likely to be encountered in the management of a class action;
(e) The practical ability of individual class members to pursue their claims without class certification;
(f) The extent to which the relief plausibly demanded on behalf of or against the class, including the vindication of such public policies or legal rights as may be implicated, justifies the costs and burdens of class litigation.
The Louisiana Supreme Court has recently on several occasions addressed the requirements for certification of class actions. See Price v. Martin, 11-0853 (La.12/6/11), 79 So.3d 960; Dupree v. Lafayette Insurance Co., 09-2602 (La.11/30/10), 51 So.3d 673; and Brooks v. Union Pacific R. Co., 08-2035 (La.5/22/09), 13 So.3d 546.
Whether a class action meets the requirements imposed by law involves a “rigorous analysis” that requires the trial court “to evaluate, quantify and weigh the relevant factors to determine to what extent the class action would, in each instance, promote or detract from the goals of effectuating substantive law, judicial efficiency, and individual fairness.” Price, 11-0853 at 6, 79 So.3d at 966-967; citing Dupree, 09-2602 at 6, 51 So.3d at 697 and *918 Brooks, 08-2035 at 10,18 So.3d at 554. In reviewing a trial court’s judgment regarding class certification, the trial court’s factual findings are subject to the manifest error standard; however, the trial [scourt’s ultimate decision of whether or not to certify the class is reviewed under the abuse of discretion standard. Price, 11-0853 at 7-8, 79 So.3d at 967.
DISCUSSION
In Dwpree, supra, the Louisiana Supreme Court, analyzing the requirements for certification of class actions, found that the trial court had abused its discretion in certifying the class action. The Court reached this conclusion based upon its finding that the trial court had manifestly erred in its findings regarding commonality, predominance and superiority. In Du-pree, the claims of the putative class members were that their property insurer had engaged in improper adjusting practices which resulted in underpayment of their claims for damages due to Hurricane Katrina. These claims involved, inter alia, undervaluing the price of materials, refusal to pay contractor overhead, taxes, and permitting fees, refusal to pay for wind damage, refusal to pay for living expenses, late payments, and a general bad faith attempt to underpay claims by taking advantage of the property owners’ circumstances. The Court noted that in order to satisfy the commonality requirement there must be a common nucleus of operative facts which when answered as to one class member, is answered as to all of them. Id. at 682-83. Because the various plaintiffs had differing issues with the insurance company, each claim would require factual findings specific to each individual claim. Although there were common elements in the claims, such as all plaintiffs being insured by Lafayette and all suffering damages due to Hurricane Katrina, these common elements did not predominate over the individual factual issues which would have to be resolved for each plaintiff. Id. at 699. In further discussing the predominance issue, the court stated:
This court has explained that the predominance requirement is more demanding than the commonality requirement, because it “entails identifying the substantive issues that will control the outcome, [9assessing which issues will predominate, and then determining whether the issues are common to the class,” a process that ultimately “prevents the class from degenerating into a series of individual trials.” Id. at 683.
In Price, supra, the Louisiana Supreme Court also reversed class certification based on commonality and predominance considerations. In that case, plaintiffs were owners of properties which were near an operation where railroad ties were treated with creosote. The members of the proposed class argued that the common elements of their claims were that the facility had negligently released contaminants into the soil and water of the surrounding countryside causing damage to their property and their health. The evidence at the certification hearing showed that although all of the proposed class members may have been damaged by the contaminants, it also showed that the extent of these damages depended on a number of discrete factors such as the distance from the facility, other potential sources of contamination, time of ownership of the property, and varying procedures used at the facility at different times and by different owners. Because all of these factors would have to be determined on an individual basis to establish causation and damages, the court ruled that the commonality test was not satisfied and consequently the predominance requirement was also not satisfied.
*919 A similar result was reached in Alexander v. Norfolk Southern Corp., 11-2793 (La.3/9/12), 82 So.3d 1234. There, noxious fumes leaked from two railroad tank cars and the proposed class consisted of people in the neighborhood who claimed to have been affected by the fumes. In reversing certification of the class, the court cited Price, supra, for the rule that in order for a case to proceed as a class action there must be significant proof, subject to rigorous analysis, of a common question — one where the determination of its truth or falsity will resolve an issue that is central to the validity of all of the claims at one stroke. Id. at 1236. |1(lBecause the evidence at the certification hearing showed that only a small percentage of the population would have had a negative reaction to the fumes, resolution of the causation and damages issues would necessarily involve inquiries into the health, medical history, and level of exposure of each plaintiff. In this circumstance, the court observed that:
Given this testimony, it is clear that each member of the proposed class will necessarily have to offer different facts to establish liability and damages. Certification under these facts would create precisely the situation we cautioned against in Brooks, i.e., the class would degenerate into a series of individual trials. Id.
On this showing, the court concluded that the proposed class did not meet the predominance test, and that it was error to certify the class.
We first apply these precepts to the Graves subclass, which consists of all patients whose records, according to the Mercer report, have Grade 2 or Grade 3 errors. There are 60 patients in this group. The evidence presented at the certification hearing showed the following facts in regard to Mrs. Graves. In 2006 she sought treatment , at the clinic. One part of her records shows that 22 eggs were retrieved, but other inconsistencies in her chart raised a question about this number. The Mercer report assigned this as a Grade 2 error with the notation “number of eggs received unclear.” The records indicate that after fertilization, 11 embryos were created, but Mrs. Graves claims that she was told by the duty nurse that 17 embryos were created. Two embryos were implanted, but neither resulted in pregnancy. Two other embryos, which matured to a point where they were deemed viable, were frozen. In 2007, Mrs. Graves returned to the clinic and the two remaining embryos were thawed by Vincent William's. Only one of those embryos survived and it was implanted; however, no pregnancy resulted. The Mercer report assigned a second Grade 2 error regarding the 2007 treatment because the sperm documentation was unclear. Mrs. Graves’s claims are | n apparently that some embryos were lost, and that one of the two frozen embryos was improperly thawed.
A review of the records of several other patients whose records had Grade 2 errors shows the following problems. Patient 277[6] was treated in 2009, but one date on her chart is 2002, an obvious error, but of questionable significance. The error involving Patient 759 has the notation “review/sign off prior to retrieval date.” For Patient 930 the notation is “embryo assessment missing.” Patients with Grade 3 errors include Patient 523 whose chart was missing a cryopreservation ID. Patient 552’s file is missing a form showing the disposition of her embryos.
Although the Mercer report categorizes the various errors in terms of their potential significance, it is clear that the actual errors in the records of the members of *920 this proposed subclass vary from patient to patient. Consequently, the proof that will be required to determine whether or not Ochsner is liable to each member of this subclass will be different from patient to patient. This conclusion is all the more likely in a case such as this that does not involve a single, discrete event that affects a large number of individuals contemporaneously. Rather, the members of this proposed subclass underwent a course of individualized fertility treatment, at differing points in time over a six year period, utilizing the services of different embryologists. Healthcare treatment, by its very nature, is highly individualized. Each patient has her own unique medical history and personal circumstances, and each patient’s record contains different documentation errors of varying significance. Additionally, the outcome of each patient’s fertility treatment varied from patient to patient. The reviewed facts relating to even this small number of plaintiffs makes it clear that there is no commonality in their claims which would satisfy the statutory requirement. For example, a trial of Mrs. Graves’s claim as to [12lost embryos and improper thawing would have no bearing on resolution of Patient 930’s claim based on a missing embryo assessment form, or Patient 277’s claim concerning a mistaken date in her file.
The class proponents argue that the common elements in all of the claims are that Ochsner did not have proper operating procedures in place and that Vincent Williams was responsible for most of the errors. Even accepting that these factors are common to all of the claims, this would still not satisfy the predominance requirement. Determinations that the clinic was not properly operated would in no way resolve the questions of causation and damages as to the discrete plaintiffs. Those questions would still require establishing the facts peculiar to each plaintiff, and the whole proceeding would degenerate into a series of individual trials. We find that the trial court abused its discretion in certifying the Graves subclass and therefore set aside the certification of this subclass.
The same analysis is applicable to the Williams subclass, made up of 53 plaintiffs. This subclass consists of all patients who had frozen embryos at the clinic as of the date of its closing. The evidence at the hearing established that, after receiving the Mercer report, Ochsner decided to follow its recommendation that no embryos be released without genetic testing to confirm parentage. This recommendation was made because of paperwork errors discovered during the audit which might raise questions about the parentage of the frozen embryos. The class proponents rely on testimony by its expert, Dr. Steven Nakajima, to the effect that the genetic testing technique to be applied is experimental and has only rarely been used. They also argue that all members of this class will need to prove that Ochsner was negligent in the operation of the clinic, that this negligence placed the parentage of the embryos in question, and that all of the plaintiffs have been |1sinjured in now having to undergo genetic testing before they may retrieve their embryos.
While there are indeed common elements in these claims, the further question is whether those elements predominate. Ochsner argues that while the plaintiffs all have frozen embryos requiring testing, their interests in those embryos depends on a number of factors specific to each plaintiff. Dr. Nakajima testified that there were a number of reasons why a patient would not want the frozen embryos and those reasons would be specific to various plaintiffs. Thus, a patient may not want other children, may be too old to become pregnant, may have divorced the *921 father of the embryo and not want another child from that union, or may have subsequently become pregnant naturally and does not intend to try IVF again. He admitted that in these cases these patients would have suffered no injury because of the operation of the clinic. On the other hand, some patients might want the embryos for a variety of other reasons. They might want more children, they might want a sibling for a previous child from the same father if a donor was used to create the embryo, or they might feel some moral imperative toward an embryo. In either case, the predominant questions to be answered will depend on the particular facts regarding each plaintiff. And again, if the matter were certified as a class, the proceedings would degenerate into a series of individual trials. We find that the trial court abused its discretion in certifying the Williams subclass and therefore set aside the certification of this subclass as well.
The final issue concerns the trial court’s denial of certification of the Jones subclass. This subclass is made up of all patients who underwent in vitro fertilization at the clinic and who suffered fear, fright, mental anguish and emotional distress as a result of Ochsner closing the clinic, but who do not fall into the definition of either the Graves subclass or the Williams subclass. The initial [^problem with this proposed subclass is that, by definition, its membership is dependent upon the state of mind of each individual class member, which is inherently subjective. The court cannot determine which former Ochsner patients have fear, fright, mental anguish and emotional distress until each of them actually testifies as to what they felt about the clinic closing. Such testimony would presumably occur during the second phase of the trial, subsequent to the determination of class certification. The proposed Jones subclass therefore violates the requirement of La. C.C.P. art. 591(A)(5) that the class be defined objectively in terms of ascertainable criteria.
Additionally, the plaintiffs have failed to establish that any questions of law and fact common to the class will predominate over questions affecting individual plaintiffs. Certification of the class requires the court to find that “each member of the class must be able to prove individual causation based on the same set of operative facts and law that would be used by any other class member to prove causation.” Price, p. 10, 79 So.3d at 969. Causation is an essential part of the liability determination, and “if causation is not the same for each plaintiff, individual trials would be required, which would defeat the purpose of the class action procedure.” Id., p. 18, 79 So.3d at 973. In this case, in order to determine causation, the trial court will have to come to an individualized understanding of each patient’s health, medical history, records, and other variables. Therefore, questions that are patient-specific and individual to each class member will predominate over any questions that are common to the subclass as a whole. Resolution of the question of whether institutional failures in the operation of the Ochsner Fertility Clinic resulted in its closure will not resolve the question of whether its closure caused harm to any of the plaintiffs in the proposed Jones subclass. Similarly, resolution of the question of whether the clinic’s closing |1Bcaused harm to the Joneses will not resolve the question of whether the clinic’s closing caused harm to any other members of the proposed Jones subclass. Questions of individual causation are the questions that will predominate in this matter, and resolution of these questions depends upon patient-specific inquiries. This again presents the problem of the proceeding degen *922 erating into a series of individual trials that would defeat the rationale for certification of the class. Therefore, we do not find that the trial court abused his discretion in denying the certification of the Jones subclass.
CONCLUSION
For the foregoing reasons, that portion of the judgment certifying the Graves subclass and the Williams subclass is reversed, that portion of the judgment denying certification of the Jones subclass is affirmed, and the matter is remanded to the district court for further proceedings.

REVERSED IN PART, AFFIRMED IN PART, AND REMANDED

. Intervenors Alan Brake and IVF Labs, LLC, who are named defendants in litigation instituted in Orleans Parish by Rachel Reitan, a former Ochsner Fertility Clinic patient, have intervened in this lawsuit for the purpose of opposing class certification. Both interve-nors also appeal that portion of the judgment granting class certification of two of the subclasses.

. Plaintiffs in No. 12-CA-240, Kim and Abraham Whitney, have settled their claims against defendants and dismissed their lawsuit; therefore, the only active case on appeal is No. 12-CA-239.

.Ochsner urged an exception of prematurity contending that this case first had to be submitted to a medical review panel, but the exception was overruled in the district court. Subsequent writ applications to this court (No. 10-CA-218) and to the Louisiana Supreme Court (No. 2010-CC-1430) were , denied. In the present posture of the case there are no issues as to whether the defendants violated any provisions of the Medical Malpractice Act, La. R.S. 40:1299.41, et seq.

. Although only 240 women treated at the clinic during the period of its operation, some women had more than one cycle; therefore, the number of cycles is more than the number of women treated.

. There was only one Grade 4 error, which was associated with Kim and Abraham Whitney. The Whitneys have settled their claims against the defendants and dismissed their lawsuit.

. To maintain privacy, all patients were given numbers.