WEIMER, Justice.
liWe granted certiorari in this lawsuit to determine whether the lower courts correctly applied the standards for analyzing class action certification set forth in La. C.C.P. arts. 591, et seq. After reviewing the record and the applicable law, we find the lower courts erred in concluding that common questions of law or fact exist, that questions of law or fact common to members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for a fair and efficient adjudication of this matter. Accordingly, we reverse the judgment of the district court which granted plaintiffs’ motion for class certification.
FACTS AND PROCEDURAL HISTORY
In February 2003, five individuals residing and owning property in Alexandria, Louisiana, in the vicinity of the Dura-Wood Treating Company (“the Dura-Wood facility”), filed on their own behalf and as representatives of a class of persons, who allegedly suffered damages as a result of operations at the wood-treating facility, a “Class Action Petition for Damages.” The petition was filed in the Twenty-third | ¾Judicial District Court, Parish of Ascension, but the matter was subsequently transferred to the Ninth Judicial District Court, Parish of Rapides, pursuant to a judgment sustaining exceptions of improper venue.[1] Named as defendants in the original petition were prior owners of the Dura-Wood facility, Roy O. Martin Lumber Company, L.P. (“Martin”), and Beazer East, Inc. (“Beazer”).[2]
The petition, which was amended several times, alleges that the Dura-Wood facility is primarily engaged in the production of creosote-treated railroad ties. According to the petition, from 1940 to mid-1950, while under the ownership and operation of Koppers Company, Inc. (now defendant Beazer), creosote and wastewater from the facility were discharged into a small creek running into Chatlin Lake Canal. Later, ponds were constructed to receive water from the wood preserving operations. Plaintiffs allege that significant quantities of creosote sludge were deposited into the canal and ponds. According to plaintiffs, in 1970, defendant Martin purchased the Dura-Wood facility and began using the contaminated ponds to receive process water.[3]
Plaintiffs allege that throughout its operation, there were spills at the facility that were never remediated. There was no containment of creosote drippings from the treating units or of runoff and/or overflow at the facility. Neighboring residents were not prohibited from entering the facility. In addition, trimmings from treated |awood were allegedly collected in a pile at the facility and neighboring residents were allowed to use the treated wood for cooking and heating.
*965 According to plaintiffs’ allegations, these environmentally unsound practices caused a significant amount of hazardous and toxic chemicals to be released into the environment, including the air, soil, and water, of the communities in which plaintiffs reside, contaminating the soil, sediments, groundwater, and buildings therein and thereon. In particular, plaintiffs allege that defendants’ wood-treating and preserving activities caused the release of creosote, hexachlorobenzene, and pentachlorophenol into their communities, exposing plaintiffs to physical injury in the form of increased risk of disease, property damage, and diminished property values. Plaintiffs allege that defendants’ activities constitute a nuisance under La. C.C. arts. 667, et seq., and that defendants were negligent under La. C.C. arts. 2315 and 2817.[4]
In November 2003, plaintiffs filed a “Motion for Certification of Class Action,” asserting that more than 3,000 persons, firms, and entities have been damaged by defendants’ conduct and that the following issues are common to the class and predominate over individual issues: (1) liability for compensatory damages, or whether “leakage, release and discharge of toxic chemical and hazardous substances from the Dura-Wood Site ... has caused the surrounding area ... to be contaminated with toxic and/or hazardous substances” and (2) liability for exemplary damages, or whether defendants engaged in the “reckless handling, transportation and/or storage of toxic and/or hazardous [substances] which are a danger to the public health.” In |4a much later filed (March 23, 2009) memorandum in support of class certifieation, plaintiffs sought certification of a class to be defined as follows:
All persons and entities, at any time since 1940 until the present time located or residing in, owning or leasing places of business or property in, operating businesses in, and/or who were or are physically present within the geographic area as defined in Section B, who claim property damage, and diminished property value, including stigmatization of the community and contamination of their homes, yards, vehicles and general living environment, including the groundwater underneath their property.
Plaintiffs argued the proposed class, which would establish “the offsite-migration of certain chemicals which originated from the DuraWood facility ... as a result of the negligent conduct of the defendants, for which they are responsible,” satisfied the requirements of La. C.C.P. art. 591(A) and (B)(3).
A hearing on the class certification issue was conducted on September 22 and 23, 2009. The matter was taken under advisement, and in February 2010, following the issuance of extensive and lengthy written reasons, the district court rendered a judgment granting plaintiffs’ motion for class certification, certifying in its reasons for judgment a class defined as “property owners who owned property within the class area at the time the property was damaged during the years of 1944 through present.”[5]
Defendants appealed the district court’s ruling, and the court of appeal affirmed. Price v. Martin, 10-599 (La.App. 3 Cir. *966 2/2/11), 56 So.3d 1109. The appellate court ultimately found no reversible error in the district court’s judgment certifying the class, although it candidly acknowledged “a number of potential problems with the class as it has been defined:” to wit, the unprecedented and extremely long period of time over which plaintiffs may claim harm; the fact that, [Balthough there is only one facility, there have been multiple owners of the facility; and the fact that inclusion of past and current landowners within the class will likely result in conflicts among those whose interests should be aligned. Price, 10-599 at 14, 56 So.3d at 1118. Nevertheless, relying on the district court’s ability, at any time before a decision on the merits of the common issues, to alter the class, redefine the class, or even recall the class certification altogether, and on prior language from this court indicating that errors in deciding class action issues should be in favor of and not against the maintenance of the class action, the court of appeal concluded that the district court did not abuse its discretion in certifying the class. Id.
We granted certiorari to review the judgments of the lower courts and, in particular, to examine whether those courts engaged in the rigorous analysis required to determine whether this action meets the requirements imposed by law for class action certification. Price v. Martin, 11-0853 (La.7/1/11), 64 So.3d 234.
DISCUSSION

Class Action Rules

Once more this court is being called on to evaluate the appropriateness of a mass tort claim for class certification. The requirements for certification of such claims have been the object of scrutiny and discussion by this court on several previous occasions. See Brooks v. Union Pacific Railroad Co., 08-2035 (La.5/22/09), 13 So.3d 546; Ford v. Murphy Oil U.S.A., Inc., 96-2913, 96-2917, 96-2929 (La.9/9/97), 703 So.2d 542; McCastle v. Rollins Environmental Services of Louisiana, Inc., 456 So.2d 612 (La.1984).
Recently, in Dupree v. Lafayette Ins. Co., 09-2602 (La.11/30/10), 51 So.3d 673, this court pointed out that extensive revisions to the class action provisions, La. C.C.P. arts. 591, et seq., were enacted by the legislature in 1997. These revisions, | fiWhich govern the present action, essentially adopted current federal law governing class actions, Fed. Rule Civ. Proc. 23, and codified this court’s prior class certification jurisprudence. Dupree, 09-2602 at 5, 51 So.3d at 679.
As a result, it remains true that “a class action is a nontraditional litigation procedure that permits a representative with typical claims to sue or defend on behalf of, and stand in judgment for, a class of similarly situated persons when the question is one of common interest to persons so numerous as to make it impracticable to bring them all before the court.” Dupree, 09-2602 at 6, 51 So.3d at 679, citing Brooks, 08-2035 at 10-11, 13 So.3d at 554. The purpose and intent of the class action is to adjudicate and obtain res judicata effect on all common issues applicable not only to persons who bring the action, but also to all others “similarly situated.” Id.
The class action is an exception to the rule that litigation be conducted by and on behalf of the individual named parties only. Wal-Mart Stores, Inc. v. Dukes, - U.S. -, 131 S.Ct. 2541, 2550, 180 L.Ed.2d 374 (2011). Thus, the determination of whether a class action meets the requirements imposed by law requires a “rigorous analysis.” Dupree, 09-2602 at 6, 51 So.3d at 697; Brooks, 08-2035 at 10, 13 So.3d at 554. Such an analysis requires the district court to “evaluate, quantify and weigh [the relevant factors] to determine *967 to what extent the class action would in each instance promote or detract from the goals of effectuating substantive law, judicial efficiency, and individual fairness.” McCastle, 456 So.2d at 618. In so doing, the court “must actively inquire into every aspect of the case and should not hesitate to require showings beyond the pleadings.” Id. In practice, the analysis will frequently entail overlap with the merits of the underlying claim. Wal-Mart Stores, Inc., 131 S.Ct. at 2551.
|7Class action rules do not set forth a mere pleading standard; rather, “[a] party seeking class certification must affirmatively demonstrate his compliance with the Rule-that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc.” Wal-Mart Stores, Inc., 131 S.Ct. at 2551.[6] While any errors to be made in deciding class action issues should, as a general rule, be in favor of and not against the maintenance of the class action because a class certification is always subject to modification or decertifi-cation if later developments so require, see La. C.C.P. art. 592(A)(3)(c),[7] that general rule cannot and should not be used as a substitute for the rigorous analysis required to determine whether the prerequisites of Louisiana’s class action provisions have in fact been satisfied. See McCastle, 456 So.2d at 616 (La. C.C.P. art. 591 requires a “close look” at a case before it is accepted as a class action).[8]
In reviewing a judgment on class certification, the district court’s factual findings are subject to the manifest error standard, while the court’s ultimate decision regarding whether to certify the class is reviewed under the abuse of discretion 1 standard, Brooks, 08-2035 at 10, 13 So.3d at 554. Whether the district court applied the correct legal standard in determining whether to certify the class is reviewed de novo. Brooks, 08-2035 at 11, 13 So.3d at 554.
The requirements for class certification applicable to this action are found in La. C.C.P. art. 591. Louisiana C.C.P. art. 591(A) sets forth five threshold prerequisites that must be met and provides:
. One or more members of a class may sue or be sued as representative parties on behalf of all, only if:
(1) The class is so numerous that join-der of all members is impracticable.
*968 (2) There are questions of law or fact common to the class.
(3) The claims or defenses of the representative parties are typical of the claims or defenses of the class.
(4) The representative parties will fairly and adequately protect the interests of the class.
(5) The class is or may be defined objectively in terms of ascertainable criteria, such that the court may determine the constituency of the class for purposes of the conclusiveness of any judgment that may be rendered in the case.
In addition to these five prerequisites, La. C.C.P. art. 591(B) lists additional requirements that must be met, depending on the type of class action sought. In this case, the parties submit that the additional requirement that must be satisfied is found in La. C.C.P. art. 591(B)(8), which provides:
The court [must find] that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to these findings include:
(a) The interest of the members of the class in individually controlling the prosecution or defense of separate actions;
| fl(b) The extent and nature of any litigation concerning the controversy already commenced by or against members of the class;
(c) The desirability or undesirability of concentrating the litigation in the particular forum;
(d) The difficulties likely to be encountered in the management of a class action;
(e) The practical ability of individual class members to pursue their claims without class certification;
(f) The extent to which the relief plausibly demanded on behalf of or against the class, including the vindication of such public policies or legal rights as may be implicated, justifies the costs and burdens of class litigation[.]
Louisiana C.C.P. art. 591(C) cautions that class “[cjertification shall not be for the purpose of adjudicating claims or defenses dependent for their resolution on proof individual to a member of the class.” Nevertheless, where certification is maintained, “the court shall retain jurisdiction over claims or defenses dependent for their resolution on proof individual to a member of the class.” La. C.C.P. art. 591(C).
The burden of proving the statutory class certification criteria have been satisfied falls on the party seeking to maintain the class action. Dupree, 09-2602 at 10, 51 So.3d at 682. In this case, the plaintiffs were thus required to prove that the five prerequisites of La. C.C.P. art. 591(A) — numerosity, commonality, typicality, adequacy of representative parties, and objectively definable class — were met. In addition, they were required to prove, consistent with La. C.C.P. art. 591(B)(3), that common questions of law or fact predominate over individual issues and that the class action is superior to any other method for resolving the controversy fairly and efficiently. For reasons explained more fully below, we find that the district court erred in ruling that the Article 591(A) prerequisite — questions of law or fact common to the class — was met and, further, in determining that the requirements of Article | in591(B)(3) were also satisfied — that common issues predominate over individual issues and that the class action is superior to any other method for *969 resolving this controversy fairly and efficiently.

Commonality

The commonality prerequisite requires a party seeking class certification to show that “[t]here are questions of law or fact common to the class.” La. C.C.P. art. 591(A)(2). This language is “easy to misread, since ‘[a]ny competently crafted class complaint literally raises common “questions.” ’ ” Wal-Mart Stores, Inc., 131 S.Ct. at 2551, quoting Nagareda, Class Certification in the Age of Aggregate Proof, 84 N.Y.U.L.Rev. 97, 131-32 (2009). The mere existence of common questions, however, will not satisfy the commonality requirement. Commonality requires a party seeking certification to demonstrate the class members’ claims depend on a common contention, and that common contention must be one capable of class-wide resolution — one where the “determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.” Wal-Mart Stores, Inc., 131 S.Ct. at 2551. As this court has succinctly explained:
To satisfy the commonality requirement, there must exist “as to the totality of the issues a common nucleus of operative facts.... ” A common question is one that, when answered as to one class member, is answered as to all of them. [Citations omitted.]
Dupree, 09-2602 at 11, 51 So.3d at 682-83.
In the context of mass tort litigation, this court has further refined the commonality requirement, stating that, in such cases, “in order to meet the common cause requirement, each member of the class must be able to prove individual causation based on the same set of operative facts and law that would be used by any other class member to prove causation.” Brooks, 08-2035 at 17, 13 So.3d at 559.
InAt the time of the hearing on plaintiffs’ motion for class certification in the present case, plaintiffs were asserting causes of action on behalf of a class of some 4,600 property owners for damage caused from 1944 to the present by the emission of toxic chemicals from operations at the wood treating facility. The essence of the causes of action, which arise under La. C.C. arts. 667, et seq.; 2315; and 2317, is that the named defendants conducted activities which unreasonably inconvenienced and damaged the property of the class members by depositing polycyclic aromatic hydrocarbons (“PAHs”)[9] and dioxins in the attic dust of their residential and commercial properties. Plaintiffs argue the commonality requirement is satisfied in this case by the existence of one factual issue common to the class members: “whether defendants’ off-site emissions caused property damage to the residences in the area surrounding the plant.”
In affirming the district court’s decision to certify the class, the court of appeal found that the common issue identified by the district court — whether the Dura-Wood facility, during the period from 1944 to the present, emitted PAHs and dioxins of such a kind and quantity as to cause harm to plaintiffs and whether plaintiffs were in fact harmed — will be resolved, not by examining individual residences, but by showing that elevated toxin levels emanated from the defendants’ facility “on a[n] area-wide basis,” and that this issue, when decided for one class member, will be. decided for all. Price, 10-599 at 8-9, 56 So.3d at 1115. This conclusion reflects a misinterpretation of the law and of plaintiffs’ burden of proof.
To establish the “common issue” they posit, plaintiffs were required to present evidence not simply that emissions oc *970 curred, but that the emissions resulted in the deposit of unreasonably elevated levels of toxic chemicals on plaintiffs’ properties; | ]2in other words, that defendants had a duty to avoid the release of unreasonable levels of contaminants from their operations, that this duty was breached, and that the breach caused plaintiffs to sustain property damage. See, e.g., Ford, 96-2913 at 11 n. 11, 703 So.2d at 549 n. 11. And, this common issue must be capable of resolution for all class members based on common evidence. See, e.g., Brooks, 08-2035 at 20, 13 So.3d at 561 (one class member must be able to prove the cause of his injury or damage based on the same set of operative facts as would be offered by every other member of the class). Moreover, proof of commonality must be “significant.” See Wal-Mart Stores, Inc., 131 S.Ct. at 2553. Even a cursory review of the facts presented at the certification hearing, those uncontested as well as those found by the district court, reveals that plaintiffs fell short of their burden. In this case neither the issue of breach nor that of causation is capable of resolution on a class-wide basis on common evidence.
With respect to the issue of breach— whether defendants breached the applicable standard of care by permitting damaging emissions — the following evidence is undisputed. The Dura-Wood facility has had three successive owners during the relevant time period (1944 to the present). Only two of those owners have presently been sued. These owners have engaged in independent and varying operations throughout the approximately 66-year period of emissions. The specific operations that plaintiffs allege resulted in off-site emissions — such as overflow, runoff, and the burning of wood by residents — have occurred at varied and unspecified times during the period in question. Moreover, the facility’s operations have changed over time. For example, the evidence demonstrates the practice of teepee burning (the use of a steel incinerator to dispose of waste wood) ceased in or around 1982. The use of pentachlorophenol, which plaintiffs allege was a major source of dioxin emissions, | isdid not begin until 1964. Depending on the nature and date of the emission, different owners could be responsible.
Further, throughout the years, the legal standards applying to the operations of the wood-treating facility have changed. For example, whether principles of strict liability or negligence will govern the conduct of defendants depends on the year the damaging emission occurred.[10] Likewise, exemplary damages are only available for conduct occurring from 1984 to 1996 pursuant to former La. C.C. art. 2315.3. The standards for air emissions vary also. Plaintiffs’ emission expert, Dr. Nicholas Cheremisinoff, testified that regulatory agencies across the country allow the release of certain levels of PAHs and dioxins into the atmosphere and that it would be “absurd” to hold a business to a zero emission standard. But, standards in 1964, after passage of the Clean Air Act, 42 U.S.C. 7401, et seq., will differ from those in effect after 1970, when the Act was broadened to cover emissions from industrial sources, as well as from those in effect after 1990, when the Act was again amended to regulate specific pollutants. Thus, a single legal standard will not apply to a single course of conduct. Class members who owned property damaged by emissions in the 1950s will not be able to rely on the same environmental standards *971 invoked by those who own property damaged by emissions in the 1980s.
The issue of breach will thus turn on different conduct, by different defendants, at different times, under different legal standards. Despite this variability, for purposes of the certification hearing, Dr. Cheremisinoff merely estimated the amount of air emissions generated by facility operations for a single year (1970). In doing so, he conceded that his calculations would not be valid for any other years. Although | uattic dust from various properties was tested for contaminants, not one of the named plaintiffs was even shown to have a contaminated attic; and, there was no attempt to determine when contaminants were deposited in the attics of the buildings that were contaminated. In short, plaintiffs offered no evidence to demonstrate that the issue of breach can be resolved from a common nucleus of facts — the same emissions or conduct by defendants were not shown to touch and concern all members of the class.
The same conclusion is obtained with respect to the issue of causation. To satisfy the commonality requirement, plaintiffs must be able to prove for each class member, with the same common evidence, a causal connection between specific emissions and damage to the class member’s property. Brooks, 08-2035 at 20, 13 So.3d at 561.
Pretermitting for a moment the question of whether, in the absence of property-specific testing, contaminants in the form of PAHs and dioxins will be found on the properties of class members in levels that exceed mere inconvenience (and injury or damage thereby established),[11] to prove common causation, plaintiffs must present significant proof that the Dura-Wood facility is the source of the attic contaminants.[12] .
Plaintiffs acknowledged, and the district court found, that there are myriad area-wide and property-specific alternative sources of PAHs and dioxins in the defined class area. In written reasons for judgment, the district court noted:
Plaintiffs’ experts have agreed that there are several property-specific con-founders for PAHs and dioxins in each home. For instance, Randy Horsak, P.E., a non-testifying expert witness for plaintiffs, stated that “how much chicken do they eat, cook, how often do they burn chicken, where does the smoke from the burnt chicken go, how many 11ficigarettes they smoke, you know, what type of air fresheners they use, all these things” can affect the levels of PAHs and dioxins. Another of plaintiffs’ non-testifying expert witnesses, Paul Rosen-feld, Ph.D., agreed that things such as cigarette smoke, fireplaces, and wood burning stoves can contribute to any alleged contamination.
Plaintiffs’ experts have also agreed that area-wide alternate sources within the proposed class area can impact the levels of PAHs and dioxins. Mr. Horsak noted that homes within two blocks of a highway can be impacted by highway emissions of PAHs and dioxins. Dr. Rosenfeld likewise acknowledged that alternate sources of PAHs in the area can be attributed to barrel burning, diesel particulate emissions from trucks and trains, fires, the burning of coal, and “atmospheric deposition from God knows where.” Dr. Shari Libicki, one of *972 defendants’ testifying expert witnesses, added that these outside PAHs and dioxins can be brought into the home through air conditioners or tracking in these substances by walking into the home. [Record citations omitted.]
The evidence thus establishes that PAHs and dioxins are ubiquitous and present in virtually all communities, including the Alexandria area. They are the byproduct of common forms of combustion— burning petroleum, gasoline, wood, coal, tires, garbage, yard refuse, and other trash; barbecuing meat and indoor cooking; home and vehicle fibres; and tobacco smoking.
Recognizing the myriad sources of PAHs and dioxins in the community that could account for and/or contribute to the contamination of dust in plaintiffs’ attics, the district court acknowledged that “[a]t this stage in the suit, plaintiffs have not provided evidence that the PAHs and dioxins found on certain pieces of property derived solely from the Dura-Wood facility.” Citing Marshall v. Air Liquide-Big Three, Inc., 08-0668 (La.App. 4 Cir. 12/17/08); 2 So.3d 541, 546, writ denied, 09-0105, 09-0111 (La.3/13/09), 5 So.3d 125, the district court in this case excused this evidentiary lapse based on a finding that the only issue to be considered at a certification hearing is whether the case is one in which the class action procedural device is appropriate, not whether the plaintiffs may prevail on the merits. In making |lfithis determination, the district court confused the issue before it — whether plaintiffs presented significant proof of common causation — with a merits determination. Evidence that a claim can exist is not evidence that it does exist or that all class members have that claim in common.
As discussed above, to prove the commonality prerequisite, plaintiffs must demonstrate that there is, in fact, a common question, one whose “truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.” See Wal-Mart Stores, Inc., 131 S.Ct. at 2551. In this case, plaintiffs must prove that they will be able to show, with common evidence, that PAHs and dioxins found in the properties of class members derived from the Dura-Wood facility. For class certification to be appropriate, there must be some common thread which holds the claims together. With regard to causation, plaintiffs failed to present sufficient evidence to prove the existence of that common thread.
Before this court, plaintiffs argue that the lack of evidence to directly link PAHs and dioxins found on tested properties to the Dura-Wood facility is not fatal to maintenance of their class action. They maintain that the most dangerous contaminants coming out of the facility were dioxins and dibenzofurans, by-products from the use of pentachlorophenol in the treatment of railroad ties, and that “all class properties received this contamination.” Plaintiffs assert that pentachlorophenol has a unique dioxin fingerprint and suggest that they can identify this fingerprint in attic dust samples from plaintiffs’ properties, thereby tracing the specific contamination in the attic dust to Dura-Wood operations and no other source.
However, as the district court pointed out, plaintiffs’ experts did not actually perform any analysis of the dioxin fingerprint found in the attic dust of the properties they tested. And, plaintiffs concede that although class membership extends back to |171944, there is no evidence of pentachlorophenol use before 1964. As a result, analysis of the dioxin fingerprint will not establish causation for all class members. Further, there is no evidence to suggest that plaintiffs will be able to trace and link a particular attic dust with a dioxin fingerprint to the conduct/emission of a specific *973 defendant. Finally, plaintiffs do not suggest there is any means of tracing PAHs— the other identified contaminants — to facility emissions; plaintiffs’ fingerprint analysis would apply only to the dioxin fingerprint of pentachlorophenol.
Given the multitude of alternate sources of PAHs and dioxins proven to exist in the area in question and the inability of plaintiffs to link those contaminants solely to emissions from the Dura-Wood facility, it is clear that plaintiffs have failed to offer significant proof that causation for each class member will be determined by a common nucleus of operative facts. The evidence demonstrates that whether contamination in the attic dust of a property was caused by emissions from the Dura-Wood facility will not turn on common evidence, such as a chemical fingerprint, but on a myriad of property-specific facts, such as whether trash was burned in a backyard pit or barrel on a particular property, the property experienced a home or vehicle fire, the residents barbecued meat or cooked food in a kitchen that was poorly ventilated, the property is located near a highway or other location subject to vehicle emissions, the residents smoked cigarettes, or any number of other property-specific factors that demonstrate a source of contamination other than emissions from the Dura-Wood facility.
In finding the common cause prerequisite for certification satisfied in this case, both lower courts relied on language from this court indicating that the requirement of common causation in a mass tort case does not also require commonality in the 11samount or extent of damages[13] to attribute the questions of whether and to what extent a property was impacted by PAHs or dioxins and whether the PAHs and dioxins came from an emission by one of the defendants or another source to the issue of damages and not causation. See Price, 10-599 at 10, 56 So.3d at 1116. However, as the decision of this court in Ford, supra, demonstrates, such questions are not ones of damages, but of causation and liability, and substantive questions of causation and liability require commonality.
In Ford, property owners filed suit claiming that four petrochemical plants emitted noxious odors, fumes and gases that, individually or in combination, caused damage to the surrounding community for a period of approximately four years. In examining whether the action met the “common character” requirement for class certification under the then-applicable version of La. C.C.P. art. 591, this court held that mass torts could be brought as a class action only if they arose from a common cause or disaster. Ford, 96-2913 at 13, 703 So.2d at 549. This holding was based on the recognition that causation is an essential part of the liability determination and if causation is not the same for each plaintiff, individual trials would be required, which would defeat the purpose of the class action procedure. In reaching this conclusion, the court reasoned:
The court of appeal made the following erroneous crucial finding ... that “[offering the same facts, all class members will attempt to establish that the activities of Mobil and Murphy emitted hazardous, toxic, corrosive, or noxious odors, fumes, gases or particulate *974 matter that caused them damage. The issue of these defendants['] duty predominates over individual questions.” However, far from offering |inthe same facts, each class member will necessarily have to offer different facts to establish that certain defendants’ emissions, either individually or in combination, caused them specific damages on yet unspecified dates (which dates may run into the hundreds or even thousands). The causation issue is even more complicated considering the widely divergent types of personal, property and business damages claimed and considering each plaintiffs’ unique habits, exposures, length of exposures, medications, medical conditions, employment, and location of residence or business. In addition, each plaintiff will have to prove that the specific harm he suffered surpassed the level of inconvenience that is tolerated under C.C. art. 668. [Citation and footnote omitted; emphasis added.]
Ford, 96-2913 at 11-12, 703 So.2d at 548-49. In Ford, this court explained that under La. C.C. arts. 667-669 (the same articles on which liability is premised in this case), a factual determination must be made as to the nature and extent of the inconvenience that each plaintiff claims and this determination “is a substantive element of liability, not merely an issue of quantum of damages.” Ford, 96-2913 at 12 n. 11, 703 So.2d at 549 n. 11. Whether an activity or work occasions real damage or mere inconvenience requires consideration of such factors as the character of the neighborhood, the degree of intrusion, and the effect of the activity on the health and safety of the neighbors, factors which do not lend themselves to resolution on a common, class-wide basis. Barrett v. T.L. James & Co., 28,170, p. 6-7 (La.App. 2 Cir. 4/3/96), 671 So.2d 1186, 1191, writ denied, 96-1124 (La.6/7/96), 674 So.2d 973.
Although the district court attempted to distinguish Ford on grounds that the Ford plaintiffs alleged that damage was caused by four petrochemical plants, whereas in this case, “the plaintiffs have alleged that damage has been caused by only one defendant, the Dura-Wood Treatment Company,” the distinction is one which does not hold up under scrutiny. Plaintiffs do not in fact allege that damage has been caused by only one defendant; they allege damage emanated from one facility, but |2qthat facility was operated successively and independently by more than one owner over a period of 66 years, providing more than one source of emissions from multiple operations performed according to varying standards of conduct. Ford, instructs that, unlike the present case, only mass torts “arising from a common cause or disaster” are appropriate for class certification. Ford, 96-2913 at 13, 703 So.2d at 550.
Ford’s instruction was reaffirmed in Brooks, a mass-tort action in which, after heavy rains caused flooding, property owners in three drainage basins attempted to certify a class based on defective drainage structures designed and maintained by multiple defendants responsible for different portions of the drainage structures. Regarding common causation, this court explained in Brooks:
[I]n order to meet the common cause requirement, each member of the class must be able to prove individual causation based on the same set of operative facts and law that would be used by any other class member to prove causation. For example, the cause of flooding must be the same for each member of the class, and if there is more than one cause of flooding, each of these causes must be the same for each class member.
Brooks, 08-2035 at 17, 13 So.3d at 559.[14] The evidence in this case demonstrates *975 that plaintiffs will be unable to meet this requirement.
Just as in Ford, far from offering the same facts, each member of the proposed class in this case will necessarily have to offer different facts to establish that each defendant’s emissions caused them specific damages on yet unspecified dates (which dates may run into the hundreds or even thousands, considering the 66-year period in question). The causation issue is further complicated by the multitude of alternate sources of PAHs and dioxins in the Alexandria area and on the individual properties of each proposed class member, and by the divergent types of properties encompassed l^by the proposed class, which include restaurants, occupied and unoccupied residences, industrial and manufacturing complexes, gas stations, agricultural lots, schools, stores, and churches. Whether the properties even have buildings with attics and, if so, the accessibility of those attics are property-specific determinations that will factor into each plaintiffs proof that the specific harm he suffered surpassed the level of inconvenience that is tolerated under La. C.C. art. 668.
As in Ford, the mere finding of a duty not to pollute will do little to advance the issues in this case. There appear to be far too many individual liability issues which must be tried separately. La. C.C.P. art. 591(C).
The application of the admonition in Ford and Brooks that only mass torts arising from a common cause or disaster are appropriate for class certification is inescapable in this case. Also inescapable is the fact that for this action, or any other action, to proceed as a class action, there must be “significant proof,” subject to “rigorous analysis,” of a common question— one where the “determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.” Wal-Mart Store, Inc., 131 S.Ct. at 2551. In the instant case, the district court mischaracterized liability determinative issues, dependent for proof on facts individual to each putative class member, as affirmative defenses and/or damage issues and, in the process, manifestly erred in concluding that plaintiffs met their burden of proving the existence of questions of law or fact common to the class.

Predominance and Superiority

To obtain class certification, in addition to proving all the requirements of La. C.C.P. art. 591(A), plaintiffs were required to prove, pursuant to La. C.C.P. art. 591(B)(3), that common questions of law or fact predominate over any individual | tissues and that the class action procedure is superior to any other. As this court recently explained:
The inquiry into predominance tests “whether the proposed classes are sufficiently cohesive to warrant adjudication by representation.” ... [T]he predominance requirement is more demanding than the commonality requirement, because it “entails identifying the substantive issues that will control the outcome, assessing which issues will predominate, and then determining whether the issues are common to the class,” a process that ultimately “prevents the class from degenerating into a series of individual trials.” [Citations omitted.]
Dupree, 09-2602 at 11-12, 51 So.3d at 683. Louisiana C.C.P. art. 591(B)(3)(a)-(f) sets forth six considerations to be weighed in determining whether the predominance and superiority requirements are satisfied.
Because we find the district court manifestly erred in determining plaintiffs satis- *976 fíed the commonality prerequisite of La. C.C.P. art. 591(A), we are compelled to conclude, as the logical corollary to that finding, that substantive questions of law and fact common to the class will not predominate over questions affecting only individual members. Thus, we find that, as with the commonality determination and for the same reasons, the district court manifestly erred in determining the predominance requirement was satisfied.
Under the unique facts of this case, we likewise find the district court erred in finding the class action is superior to other methods. In Brooks, this court stressed that in making the superiority determination, the district court must “evaluate, quantify, and weigh [the relevant factors] to determine to what extent the class action would in each instance promote or detract from the goals of effectuating substantive law, judgment efficiency, and individual fairness.” Brooks, 08-2035 at 10, 13 So.3d at 554. The legislature has since codified the factors deemed pertinent to this analysis. See La. C.C.P. art. 591(B)(3). Our examination of those factors convinces | aaus that the class action is not superior to other methods for resolution of this controversy.
Louisiana C.C.P. art. 591(B)(3)(a) directs the court to consider “[t]he interest of the members of the class in individually controlling the prosecution or defense of separate actions.” With regard to this consideration, we find that the claims are so highly individualized that class certification likely will be unfair to members who have claims stronger than the named representatives. Pertinent to this determination are the serious and significant issues created by the distl'ict court’s inclusion of both past and present property owners in the class. In defining the class to consist of “property owners who owned property within the class area at the time the property was damaged,” the district court created conflicts among past and present owners that favor individual, rather than class resolution, of their respective damage claims. For example, the district court found that named plaintiff Roger Price has standing to pursue damage claims on four separate properties that he purchased during the class period. Each of these claims creates a conflict between the prior owners of the respective properties and him. With respect to property at 3641 Bethel Street, the court found that Mr. Price has standing to pursue a claim for property damage occurring after 1971, the date of purchase. Based on the class certification approved by the lower courts, prior owners of the property would also have standing to sue for damages occurring during their period of ownership, but Mr. Price’s interest in maximizing the damages during his ownership conflicts with that of the prior owners. The existence of such conflicts overwhelmingly militates against the class action procedure.
Also militating against class certification is the fact that over 500 putative class members have already brought individual claims against these same defendants for | ¡.¿personal injuries and property damage allegedly caused by the same facility emissions. See Paige v. Dura-Wood, LLC, No. 214-913, Ninth Judicial District Court, Parish of Rapides. Because we find no common issues exist among the putative class members in this case, and the merits of each case will turn on individual proof of liability, the extent and nature of the litigation already commenced do not suggest class certification will add to fairness and efficiency. See La. C.C.P. art. 591(B)(3)(b).
As to the desirability or undesirability of concentrating the litigation in Rapides Parish,[15] we find that no common factual *977 or legal issues exist that would militate in favor of having plaintiffs’ claims adjudicated in a single forum. The difficulties likely to be encountered in the management of a class action such as that proposed by plaintiffs do not warrant a finding that the class action is a superior method for fair and efficient adjudication of this controversy. See La. C.C.P. art. 591(B)(3)(d). In fact, plaintiffs have acknowledged that injury and causation are not susceptible to class-wide resolution and have proposed a series of mini-trials on this issue with respect to each putative class member, undermining the efficiency of the class action in the resolution of this controversy. Further, while plaintiffs insist that the expense of testing places individual litigation outside the financial ability of any homeowner in the area of the Dura-Wood facility, and deprives property owners of the practical ability to pursue their claims without class certification,[16] plaintiffs have not shown the litigation cannot be handled efficiently under rules of joinder and cu-mulation of actions. See La. C.C.P. arts. 461 et seq.
^Finally, we do not find the vindication of public policies or legal rights justifies the costs and burdens of class litigation. See La. C.C.P. art. 591(B)(3)(f). As we noted in Dupree, “[w]hen there are a myriad of individual complaints that ultimately will require plaintiff-by-plaintiff adjudication of liability issues, this will militate against a finding of predominance of common character and the superiority of the class action procedure.” Dupree, 09-2602 at 43, 51 So.3d at 701, quoting Davis v. Jazz Casino Co., L.L.C., 03-0005 (La.App. 4 Cir. 1/14/04), 864 So.2d 880, 889, writ denied, 04-0572 (La.4/23/04), 870 So.2d 304. This is especially true given the legislative policy of La. C.C.P. art. 591(C) — that class certification “shall not be for the purpose of adjudicating claim or defenses dependent for their resolution on proof individual to a member of the class.”
CONCLUSION
For the reasons set forth above, we conclude the district court manifestly erred in finding the requirements of La. C.C.P. art. 591(A)(2) — questions of law or fact common to the class — were proved. The district court likewise erred in finding, under La. C.C.P. art. 591(B)(3), that common issues of law or fact predominate over individual questions and that the class action procedure is superior to other available methods for fairly and efficiently adjudicating the claims asserted. As a consequence, we find that the district court abused its discretion in accepting this matter as a class action and in certifying the class. We therefore reverse the appellate court’s judgment affirming the district court’s class action certification, reverse the district court’s ruling granting the motion for class certification and certifying the class, and remand the case for further proceedings.
REVERSED AND REMANDED.

. District court judgments overruling defendants' exceptions of improper venue were reversed on appeal, and the case was remanded for transfer to a parish of proper venue. See Price v. Roy O. Martin Lumber Company, 04-0227 (La.App. 1 Cir. 4/27/05), 915 So.2d 816, writ denied, 05-1390 (La.1/27/06), 922 So.2d 543.

. A third named defendant, Vulcan Materials Company, was later dismissed on plaintiffs' motion.

.Facts developed subsequent to the filing of the petition reveal that Martin owned and operated the facility from mid-1970 until December 31, 1999, when it was sold to Rail-works Wood Products, Inc. ("Railworks”). Although Railworks took over the operations of the facility after the sale, and continues to operate the facility, it has not been named as a defendant in this action.

. In addition to compensatory damages, plaintiffs seek exemplary damages for those damages sustained during the period of time in which La. C.C. art. 2315.3 permitted recovery of exemplary damages for wanton or reckless disregard of public safety in the storage, handling, or transportation of hazardous or toxic substances.

. The class area was defined as the entire area within a circle having "a radius of one and one-half mile[s] with the center of the circle being located at the point in the Dura-Wood facility.”

. While the Supreme Court’s discussion in Wal-Mart Stores, Inc. centers on Fed. Rule Civ. Proc. 23, this court has previously held that, to the extent La. C.C.P. art. 591 parallels Rule 23 regarding class actions, Louisiana’s class certification analysis is appropriately informed by federal jurisprudence interpreting Rule 23. Dupree, 09-2602 at 14 n. 8, 51 So.3d at 684 n. 8

. La. C.C.P. art. 592(A)(3)(c) provides:
In the process of class certification, or at any time thereafter before a decision on the merits of the common issues, the court may alter, amend, or recall its initial ruling on certification and may enlarge, restrict, or otherwise redefine the constituency of the class or the issues to be maintained in the class action.

.To the extent that language in McCastle, particularly the statement that ”[i]f there is to be an error made, it should be in favor and not against the maintenance of the class action” McCastle, 456 So.2d at 620, has been interpreted by courts as relaxing the plaintiffs’ burden in establishing the appropriateness of the class action for a particular case or the court’s role in evaluating whether the required statutory showing has been met, it has been misinterpreted. This general rule does not obviate the requirement that courts employ a "rigorous analysis” and take a "close look” at a case to determine if, in fact, the statutory requirements have been satisfied before accepting it as a class action. See Dupree, 09-2602 at 6, 51 So.3d at 679; Brooks, 08-2035 at 10, 13 So.3d at 554; McCastle, 456 So.2d at 616.

. Polycyclic aromatic hydrocarbons are constituents of creosote.

. In Loescher v. Parr, 324 So.2d 441 (La.1975), this court held that claims under La. C.C. art. 2317 are governed by principles of strict liability. That changed in 1996 with the enactment of La. C.C. art. 2317.1. See 1996 La. Acts, 1st Ex.Sess., No. 1, § 1, effective April 16, 1996.

. The lower courts dismissed the question of whether contaminants in the form of PAHs and dioxins will be found on the properties of class members in levels that exceed mere inconvenience as a question of damages, not causation. This determination is examined more fully infra.

. See Wal-Mart Stores, Inc., 131 S.Ct. at 2553.

. In Bartlett v. Browning-Ferris Industries Chemical Services, Inc., 99-0494 (La.11/12/99), 759 So.2d 755, 756, this court explained that “the mere fact that varying degrees of damages may result from the same factual transaction and same legal relationship or that class members must individually prove their right to recover does not preclude class certification.” See McCastle, 456 So.2d at 620 ("With respect to the question of damages, individual questions of quantum do not preclude a class action when predominant liability issues are common to the class.”).

. The court of appeal’s attempts to distinguish Brooks on grounds that the common *975 event in this case is "attributable to a singular facility,” fails for the same reason that same distinction, drawn by the district court in an effort to distinguish Ford, fails. Price, 10-599 at 9-10, 56 So.3d at 1116.

. La. C.C.P. art. 591(B)(3)(c).

. La. C.C.P. art. 591(B)(3)(e).