# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 15-11

CHERYL HILL, ET AL

VERSUS

SHERIFF SID HEBERT, ET AL

**********

APPEAL FROM THE
SIXTEENTH JUDICIAL DISTRICT COURT
PARISH OF IBERIA, NO. 114131
HONORABLE CHARLES LEE PORTER, DISTRICT JUDGE

**********

## SHANNON J. GREMILLION
## JUDGE

**********

Court composed of John D. Saunders, Shannon J. Gremillion, and David Kent Savoie, Judges.

**AFFIRMED; REMANDED WITH INSTRUCTIONS.**

James Patrick MacManus
Law Office of James P. MacManus
225 West Main Street
Lafayette, LA 70501
(337) 234-1720
COUNSEL FOR PLAINTIFFS/APPELLEES:
    Cheryl Hill, et al

**James L. Pate**
**Ben L. Mayeaux**
**Sara Rodrigue**
**Neuner Pate**
**1001 West Pinhook Road, Suite 200**
**Lafayette, LA 70503**
**(337) 237-7000**
**COUNSEL FOR DEFENDANTS/APPELLANTS:**
    **Sheriff Sid Hebert, et al**

 **J. Wayne Landry**
**Attorney at Law**
**P. O. Box 12132**
**New Iberia, LA 70560-2132**
**(337) 369-4420**
**COUNSEL FOR DEFENDANT/APPELLEE:**
    **Iberia Parish Council**

**Joy Rabalais**
**Borne & Wilkes**
**P. O. Box 4305**
**Lafayette, LA 70502-4305**
**(337) 232-1604**
**COUNSEL FOR DEFENDANTS/APPELLEES:**
    **Hilda Curry, et al**

**GREMILLION, Judge.**

The defendants, a sheriff and five of his deputies, appeal the trial court's judgment certifying a class action suit against them. For the following reasons, we affirm and remand with instructions consistent with this opinion.

## FACTUAL AND PROCEDURAL BACKGROUND

This case involves the defendants' use of tear gas to disburse a crowd on September 24, 2006, during the Sugar Cane Festival in New Iberia, Louisiana. Various deputies deployed the tear gas three separate times at three different locations.

The plaintiffs filed a class action petition for damages in April 2009. Their motion for class certification was filed in August 2011. Following hearings in the summer of 2013, the trial court granted the class certification. In a lengthy judgment rendered in June 2014, the trial court found that the requirements of La.Code Civ.P. art. 591(A) and (B)(3) were met, and that there were questions of law and fact common to the class that predominated over questions affecting only individual members. The defendants appeal that class certification and assign as error:

1. The trial court erred in finding the plaintiffs satisfied the commonality requirement.

2. The trial court erred in finding that questions of law and fact common to the class predominate over questions affecting only individual members.

3. The trial court erred in finding that a class action is superior to other available methods of fair and efficient adjudication of the controversy.

4. The trial court erred in finding the typicality requirement was satisfied.

5. The trial court erred in finding that the class representatives fairly and adequately protect the interest of the class.

## DISCUSSION

The Louisiana Supreme Court has set forth the law regarding class action certification as follows:

> "'[A] class action is a nontraditional litigation procedure that permits a representative with typical claims to sue or defend on behalf of, and stand in judgment for, a class of similarly situated persons when the question is one of common interest to persons so numerous as to make it impracticable to bring them all before the court.'" *Dupree* [*v. Lafayette Ins. Co.*], 09-2602 at 6 [(La.11/30/10)], 51 So.3d [673] at 679, *citing Brooks* [*v. Union Pacific Railroad Co.,*] 08-2035 at 10-11 [(La. 5/22/09)], 13 So.3d [549] at 554. The purpose and intent of the class action is to adjudicate and obtain res judicata effect on all common issues applicable not only to persons who bring the action, but also to all others "similarly situated." *Id.*
>
> The class action is an exception to the rule that litigation be conducted by and on behalf of the individual named parties only. *Wal-Mart Stores, Inc. v. Dukes,* __ U.S. __, 131 S.C.t 2541, 2550 [] (2011). Thus, the determination of whether a class action meets the requirements imposed by law requires a "rigorous analysis." *Dupree*, 09-2602 at 6, 51 So.3d at 697; *Brooks*, 08-2035 at 10, 13 So.3d at 554. Such an analysis requires the district court to "evaluate, quantify and weigh [the relevant factors] to determine to what extent the class action would in each instance promote or detract from the goals of effectuating substantive law, judicial efficiency, and individual fairness." *McCastle* [*v. Rollins Environmental Services of Louisiana, Inc.*]456 So.2d [612] at 618 [La.1984]. In so doing, the court "must actively inquire into every aspect of the case and should not hesitate to require showings beyond the pleadings." *Id.* In practice, the analysis will frequently entail overlap with the merits of the underlying claim. *Wal-Mart Stores, Inc.*, 131 S.Ct. at 2551.
>
> Class action rules do not set forth a mere pleading standard; rather "[a] party seeking class certification must affirmatively demonstrate his compliance with the Rule-that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Wal-Mart Stores, Inc.*, 131 S.Ct. at 2551.
>
> While any errors to be made in deciding class action issues should, as a general rule, be in favor of and not against the maintenance of the class action because a class certification is always subject to modification or decertification if later developments so

2

require, *see* La. C.C.P. art. 592(A)(3)(c), that general rule cannot and should not be used as a substitute for the rigorous analysis required to determine whether the prerequisites of Louisiana's class action provisions have *in fact* been satisfied. *See McCastle*, 456 So.2d at 616 (La. C.C.P. art. 591 requires a "close look" at a case before it is accepted as a class action).

In reviewing a judgment on class certification, the district court's factual findings are subject to the manifest error standard, while the court's ultimate decision regarding whether to certify the class is reviewed under the abuse of discretion standard. *Brooks*, 08-2035 at 10, 13 So.3d at 554. Whether the district court applied the correct legal standard in determining whether to certify the class is reviewed *de novo*. *Brooks*, 08-2035 at 11, 13 So.3d at 554.

*Price v. Martin*, 11-853 pp. 6-8 (La. 12/6/11), 79 So.3d 960, 966-967

(footnotes omitted).

Louisiana Code of Civil Procedure Articles 591 and 592 address the prerequisites, summarily referred to as numerosity, commonality, typicality, adequacy of representative parties, and objectively definable class, necessary to maintain a class action and the certification procedure undertaken by the trial court. Pursuant to La.Code Civ.P. art. 591(A):

One or more members of a class may sue or be sued as representative parties on behalf of all, only if:

(1) The class is so numerous that joinder of all members is impracticable.

(2) There are questions of law or fact common to the class.

(3) The claim or defenses of the representative parties are typical of the claims or defenses of the class.

(4) The representative parties will fairly and adequately protect the interests of the class.

(5) The class is or may be defined objectively in terms of ascertainable criteria, such that the court may determine the constituency of the class for purposes of the conclusiveness of any judgment that may be rendered in the case. This prerequisite shall not be satisfied if it is necessary for the court to inquire into the merits of each potential class member's cause

3

of action to determine whether an individual falls within the defined class.

Paragraph B of La.Code Civ.P. art. 591 further requires that, in addition to the previous prerequisites being met, the commonality requirements must also be met, more specifically in this case:

(3) The court finds that questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to the other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to these findings include:

   (a) The interest of the members of the class in individually controlling the prosecution or defense of separate actions;

   (b) The extent and nature of any litigation concerning the controversy already commenced by or against members of the class.

   (c) The desirability or undesirability of concentrating the litigation in the particular forum;

   (d) The difficulties likely to be encountered in the management of a class action;

   (e) The practical ability of individual class members to pursue their claims without class certification;

   (f) The extent to which the relief plausibly demanded on behalf of or against the class, including the vindication of such public policies or legal rights as may be implicated, justified the costs and burden of class litigation; or

*Testimony from the Certification Hearing*

Delphina Walker, owner of Gator's Barbecue, located in the 600 block of Hopkins Street near the intersection of Hopkins Street and Robertson Street, testified that she and her husband, Edward Charles Walker, were working in their barbecue stand on the day of the events in question. She said they arrived early to prepare hot dogs for the kids. Walker provided a disc jockey, who was playing loud music. She estimated the crowd numbered "no more than five hundred." She

said there were infants to the elderly in attendance. She characterized the celebration as a family event. Walker said she heard no warnings and that no officers approached her to request the use of the public address system. Walker said there was no fighting or motorcycle engines being revved. She described chaos following the sudden and unexpected teargas "attack." Walker believed that her barbecue stand business failed due to the teargasing, because people, especially the elderly, were afraid to come out after the attack. Walker admitted there was a lot of motor vehicle traffic and pedestrian traffic crossing the street. She further admitted that she was inside the Gator's barbecue stand when the first teargasing occurred. However, she said she could see what was going on through a window. She admitted that bottles and rocks were thrown at the police officers, but only after the teargasing had started.

Cheryl Ann Hill, Walker's sister, testified she was at the Hopkins and Robertson Street location during the festival. She arrived at about 11:00 a.m. in order to help her sister make hotdogs for the kids. She estimated that there were between three and five hundred people in the area including about sixty kids. Hill said there was no fighting in the area or people throwing beer bottles. Hill denied hearing any warning from the police indicating that it was time to go home or that the streets needed to be cleared. She only heard Walker's husband tell the disc jockey to announce that the last song was going to be played. As she started toward her car, Hill said a can of tear gas hit her on the shoulder while she was carrying her eight-month-old grandchild. She testified that the crowd ran screaming, and that people were choking from the teargas. Hill left immediately because she was scared for her life. Thus, she was unaware of what happened after the initial tear gas was administered. Hill suffered a bruise on her shoulder and

5

coughing and sore throat for two days following the incident. On cross-examination, Hill claimed that she could represent those people who stayed after she left and those who may have been blocking traffic or causing other disturbances.

Bradley Simon was fifteen years old at the time of the festival and testified as a listed class representative. Simon said that he arrived at around 4:30 p.m. having walked from his father's house, which was right around the corner from Gator's. Simon was in the same area that Hill, Walker and her husband, and others were. Simon denied seeing any fighting or throwing of beer bottles. He said that he ran immediately once the police administered the first round of tear gas. Simon said he heard no warnings from the police, and that the police were just "amongst theirself, talking amongst theirselves" before administering the tear gas. He said the tear gas sounded like fireworks, but when it hit the ground everyone went running. Simon estimated the crowd to be about three or four hundred people in front of Gator's but closer to between seven hundred and a thousand people in the three block area in which the festival was being celebrated. He estimated that there were about fifty children dancing in the Gator's area. Simon described hollering and screaming following the teargas and estimated that two hundred people were affected by the tear gas. He said he felt "disappointed" because the police "had no probable cause of doing that . . . Everybody was just enjoying they self." Simon said the tear gas affected his asthma a little bit for a few days. Although he had no idea what it meant to be a class representative, Simon felt qualified because it "wasn't right."

Edward Mitchell, Walker's son, who was twenty-nine at the time of the hearing, arrived at the festival in the late afternoon. He estimated there were

between two and three hundred people in the Gator's area with seventy-five to one-hundred of those being children. Mitchell said that after the first tear gas was administered, he and his mother approached the police to ask why they were doing it. However, Mitchell's fiancé was pregnant at the time and prone to anxiety attacks, so he left to take her to the emergency room. Mitchell said the tear gas made his eyes burn and that he felt like he could not breathe. Mitchell said he felt disrespected. He felt that at least 150 people were affected by the teargas. Mitchell stated that prior to the teargas administration, he did not see any fighting, throwing of beer bottles, hollering, or screaming in the crowd. He never heard a warning from the police prior to the tear gas.

Rebecca Etienne, who was sixteen at the time of hearing and nine at the time of the festival, estimated there were four hundred people in front of Gator's, around one hundred of which were kids. Etienne is Hill's niece, Simon's cousin, and Mr. Walker's cousin. Etienne said that the police stood around for about thirty minutes before they administered the tear gas without warning. Etienne and her mother left immediately amongst the screams and yelling. Etienne said she was scared, her eyes were burning, and she was coughing but was fine the next day.

Sergeant Jeffery Schmidt of the Iberia Parish Sherriff's Office prepared a report two days following the September 24, 2006 incident. Sergeant Schmidt testified that he was dispatched to the Hopkins/Robertson Street area because there were complaints that traffic was at a standstill due to people being in the street and vehicles blocking the street. Sergeant Schmidt said his instructions from his supervisor, Lieutenant Stephen Hill, were to clear the street. Sergeant Schmidt said that he and four other officers were in the area. He said that the first thing they did was have Lieutenant Brett Broussard announce on the public address

system to clear the street or gas would be deployed. He said the announcement was made at least three times. Sergeant Schmidt said the only reaction from the crowd was that the motorcycles parked at Brook's Tire, which was located across the street from Gator's, would start revving their motors. He said the motorcycles were approximately seventy yards from where Lieutenant Hill was making the announcements.

Sergeant Schmidt estimated the crowd to be about eight hundred people. Schmidt said that initially two cans of teargas were deployed by himself and Deputy Broussard, both of which were hand thrown. He said he threw his into the street with the intention of clearing the street. Following the deployment, Sergeant Schmidt said that some people in the crowd immediately started throwing bottles at the officers. At that point, the officers deployed another round of teargas canisters.

Sergeant Schmidt said the situation escalated, and the crowd started to surround them while yelling and threatening them. The officers retreated one block in their cars because, Sergeant Schmidt said, they were afraid. The deputies were later called to return to the area because another officer requested assistance for a deputy who was getting "overrun by people." At this point, Sergeant Schmidt said teargas was deployed again.

Sergeant Schmidt estimated that he was at the location about forty minutes before the deployment of the teargas. He said that he did not see any children in the area or elderly people nor did he see any fighting. Prior to the teargas he did not see anyone making threats toward the police or bottles being thrown.

Detective Jeremy Hatley of the Broussard Police Department was a sergeant at the time of this incident. Detective Hatley's unit was the third or fourth one to arrive on the scene, where he observed a large crowd and stagnant traffic. Upon

8

exiting his vehicle, he heard motorcycles revving their engines. He observed a hit-and-run of a black SUV in which a motorcycle ridden by a man and a woman slid underneath an SUV and then took off. Detective Hatley said the police had their overhead lights on. Detective Hatley heard Deputy Broussard's warnings and testified that he gave warnings over the public address system prior to Deputy Broussard. He estimated that the warnings, between them, were less than ten but more than five. However, he said that the crowd did not obey any of the warnings to disburse. Detective Hatley did not disburse any of the initial teargas, but said that the crowd reacted violently by surrounding the police and throwing bottles at them. Detective Hatley then deployed a teargas unit. He said he was struck by shattering glass, and his unit was struck by glass bottles. Detective Hatley was in two different locations that evening. Although Detective Hatley did not see any violent behavior upon his arrival at the scene, he could only see a portion of the crowd. He did not go any further into the crowd because he feared for his safety based on being shot at in the same area on two different occasions.

Katherine Guidry was in attendance at what she described as a "block party." Guidry testified that she heard the officer warnings but did not respond in any way and continued to stay in the area despite being told to leave. However, she said some people were preparing to leave. Once the tear gas was disbursed, Guidry went to her car, where she sat for an hour, because she was blocked in. Guidry said her eyes burned from the teargas.

## CERTIFICATION OF THE CLASS ACTION

The primary issues in this case center on whether there is adequacy of representation and whether the commonality requirements are met, such that the class, as defined, can be certified. We note at the outset that the claims asserted by

the plaintiffs are particularly suited to class action litigation because the ability of the parties to pursue individual claims would be impractical in that the expense of litigation would far surpass any reasonable award. *See Duhé v. Texaco, Inc.*, 99-2002 (La.App. 3 Cir. 2/7/01), 779 So.2d 1070, *writ denied*, 01-637 (La. 4/27/01), 791 So.2d 637. Further, the law favors maintenance of the class action because of the flexibility the trial court has to modify the certification as required. *See Price*, 79 So.3d 960 and La.Code Civ.P. art. 592(A)(3)(c).

Nevertheless, we find that the trial court erred in finding that there are questions of law or fact common to the class that predominate over individual issues based on the current class definition. The lone fact that some people in the area of Hopkins and Robertson Streets were subject to tear gas is insufficient to meet the commonality requirement.

> The mere existence of common questions . . . will not satisfy the commonality requirement. Commonality requires a party seeking certification to demonstrate the class members' claims depend on a common contention, and that common contention must be one capable of class-wide resolution-one where the "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." As this court has succinctly explained:
>
>> To satisfy the commonality requirement, there must exist "as to the totality of the issues a common nucleus of operative facts. . . . " A common question is one that, when answered as to one class member, is answered as to all of them.

*Price*, 79 So.3d 960 at 969 (citations omitted).

In the present case, the class was defined as:

All persons who have been and[/]or claim to have been injured or otherwise damaged as a result of the tear gas attack or other disbursal measures resulting from the use of force to disburse citizens celebrating the Sugarcane Festival in New Iberia, Iberia Parish, Louisiana on September 24, 2006 at Hopkins Street near the intersection of Robertson Street.

10

The testimony from the certification hearing revealed that only those who heard no warning and immediately left the area were represented. Although we find no manifest error in the trial court's factual findings, we find the trial court legally erred in finding that common issues predominate over this group of claimants and those who remained for, or possibly came upon the scene of, the second and third deployments. In its reasons for judgment the trial court stated:

> After the first deployment of tear gas agents, many in the crowd immediately left the area. The court agrees with Defendants' assertion that other persons remained at the intersection and confronted the deputies by thr[o]wing rocks and glass bottles. Fault, causation, and damages, are susceptible to class-wide, or subclass determination. Therefore, the predominance requirement is met. Defendants did not challenge class definition or numerosity. Plaintiffs have demonstrated commonality, typicality and adequacy of the representation on the record. The class or subclass allegedly opposing Sherriff Deputies (some actually assaulted the deputies by throwing rocks and beer bottles) may not self-identify.

In a footnote following this passage, the trial court stated:

> For example, the jury could conclude that there is no comparative fault for a class member sitting peacefully on private property, for those who did not hear an order to disburse, for those who did not confront or assault the deputies, or those who left the area once agents were employed. In contrast, the jury would likely reach an entirely different conclusion for a class who committed aggravated assault or battery of an officer.

The trial court continued:

> The court is prepared to classify and adjudicate such claims, if any. Evidence supporting a very small class of persons allegedly opposing Sheriff Deputies, range at a high point at "dozens" compared to the potential class of "hundreds" who occupied Hopkins Street just before the tear gas events. The test to determine whether fault is an issue common to all class members is whether the ["]same set of operative facts and law" necessary to prove one class members' case would also apply to every other class member. *Brooks v. Union Pacific Railroad Company*, 13 So.3d at 558. The court is persuaded that [the] proposed class meets the test or the procedure contains the flexibility to accommodate more than one class or subclass.

11

The Court does not find merit in Defendants' argument on causation as a question common to the entire class. The class members contend their damages were caused by the deployment of disbursal agents (or by injury incurred while attempting to leave the area). The initial disbursal agents were deployed by two deputies.

After this initial deployment, many, if not most, individual[s] left the area. However, others stayed to confront and assault the deputies resulting in the deployment of additional disbursal agents by additional deputies. Consequently, a different group of defendants would be responsible (if at fault) for any tortuous injury sustained by class members as a result of the second use of agents. The same would be true for the third and final deployment of disbursal agents that occurred much later during this incident at a different location after more class members had left the area. The agents were deployed by yet another group of defendants. And, therefore, a different group of defendants would be responsible (if at fault) for any tortuous injury sustained by class members as a result of the final deployment of disbursal agents. The court finds that certification of the class of Plaintiffs and any subclasses of Defendants, if any will address the issues of fault, causation and damages.

A footnote following states:

Some class members may claim injury caused by the initial deployment only. Some may claim injury caused by both the initial and second use of agents. And some may claim injury caused by all deployments of disbursal agents. All of this depends upon the location of the class member when exposed to the agents, whether the class member left the scene or remained to confront the deputies, and whether the class member moved from location to location during the incident.

However, there are no common claims amongst people who claimed not to have heard any warnings but left immediately once the first tear gas was disbursed, people who heard the warnings but refused to leave, and people who may or may not have heard the warnings but reacted with criminal behavior toward the police in response. Based on the various locations and disbursements, it is impossible for the class members to prove individual causation because the same set of operative facts do not exist. There will be no common evidence; rather there will be evidence based on three different disbursals involving very different types of

12

plaintiffs that are plainly antagonistic to each other. The supreme court requires that proof of commonality be "significant." *See Price*, 79 So.3d 960 at 970. The central fact that tear gas was disbursed is not significant enough to warrant a class action certification amongst all three groups of people. There is no dispute that tear gas was disbursed, but the numerous factors involved in the various disbursals in several locations warrant a finding that common issues do not predominate over individual ones. The defendants' liability, if any, will differ based on different plaintiffs, and different locations and times.

The proposed class members simply do not have claims in common such that a class certification is warranted based on the current definition of the class. However, La.Code Civ.P. art. 592(A)(d) clearly authorizes the trial court to "alter, amend, or recall its initial ruling certification and may enlarge, restrict, or otherwise redefine the constituency of the class." We can affirm the certification of the class despite its substandard definition because the trial court can remedy this error on remand. Thus, we affirm the trial court's class action certification, but remand to the trial court to redefine the class based on the evidence that was put forth at the certification hearing.

## CONCLUSION

The judgment of the trial court certifying the class action of the plaintiffs, Cheryl Hill, et al, is affirmed. However, this case is remanded to the trial court with the instruction that it redefine the class to include only that group of individuals meeting the commonality and typicality requirements represented at the certification hearing. Costs of this appeal are assessed equally between the parties.

**AFFIRMED AND REMANDED WITH INSTRUCTIONS**.